United States Court of Appeals
Fifth Circuit

**F I L E D**

**October 31, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

————————————————

No. 04-11032

————————————————

JAIME GARCIA; MARIA LUISA GARCIA,

Plaintiffs-Appellants,

versus

LUMACORP INC; LUMACORP INC, as agent for MDWR Ltd,

Defendants-Appellees.

---------------------
Appeal from the United States District Court
for the Northern District of Texas
---------------------

Before HIGGINBOTHAM, WIENER, and DENNIS, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff-Appellants Jaime and Maria Luisa Garcia appeal the
district court's grant of summary judgment in favor of Defendant-
Appellee LumaCorp on all claims asserted in this action which arose
out of Mr. Garcia's work-related injury. As we perceive no error
in the district court's determination of Mr. Garcia's coverage
under LumaCorp's Employee Injury Benefit Plan or in its giving
effect to the parties' settlement agreement, we affirm.

I. FACTS AND PROCEEDINGS

In October 2000, Jaime Garcia, then an assistant maintenance
worker at the Villages of Meadow West Apartments in Dallas, was
injured on the job when a solution of pool chemicals he was mixing
exploded in his face. He sustained serious chemical burns to his

face, head and body, as well as a cerebral injury resulting from his exposure to the solution.  Garcia required extensive medical treatment for his injuries and was never able to return to work.

Garcia's employer at the time of his injury, Defendant-Appellee LumaCorp, Inc., manages multifamily residential apartment complexes in the Dallas area, including the Villages of Meadow West.  At all times relevant to this litigation, LumaCorp was a nonsubscriber under the Texas Workers' Compensation Act.[1]  As an alternative to participating in the statutory workers' compensation scheme, LumaCorp adopted an Employee Injury Benefit Plan ("the 1993 Plan") to provide eligible employees with medical disability and wage replacement benefits in the event of a work-related injury.

The 1993 Plan required new LumaCorp employees who began working at LumaCorp on or after January 1, 1994, to execute a voluntary election form as a condition of participation in the Plan.  The election form contained a waiver and release of all causes of action against LumaCorp arising from injuries sustained in the course and scope of employment, as well as a waiver of the

---

[1] The Texas Workers' Compensation Act, which governs the distribution of benefits to workers injured on the job, permits but does not require employers to obtain workers' compensation insurance coverage.  See TEX. LAB. CODE ANN. § 406.002 (Vernon 2005); Lawrence v. CDB Servs., Inc., 44 S.W.3d 544, 552 (Tex. 2001), *superseded by statute on other grounds*, TEX. LAB. CODE ANN. § 406.033(e) (emphasizing that "from its inception, participation in the Act has been voluntary.").

right to sue LumaCorp in connection with such injuries, the employee's sole remedy being benefits under the Plan.[2]

Garcia became an employee of LumaCorp in August 1998. On his employment application he indicated proficiency in both Spanish and English. Several days later, Garcia signed the election form required for his participation in the 1993 Plan. Specifically, the election form he signed specified that

> THE UNDERSIGNED HEREBY IRREVOCABLY AND UNCONDITIONALLY RELEASES AND WAIVES ANY AND ALL CLAIMS OF ACTION, WHETHER NOW EXISTING OR ARISING IN THE FUTURE, THAT THE UNDERSIGNED MAY HAVE AGAINST ... LUMACORP, INC. ... THAT ARISE OUT OF OR ARE RELATED TO INJURIES ... SUSTAINED BY THE UNDERSIGNED IN THE COURSE AND SCOPE OF THE EMPLOYMENT OF THE UNDERSIGNED BY ... LUMACORP, INC.
>
> I UNDERSTAND THAT BY EXECUTION OF THIS DOCUMENT, I WILL LOSE THE RIGHT TO SUE ... LUMACORP, INC. ... IN CONNECTION WITH INJURIES ... SUSTAINED DURING THE COURSE AND SCOPE OF MY EMPLOYMENT WITH ... LUMACORP, INC.; AND, FURTHER, THAT MY ONLY REMEDY WILL BE TO RECEIVE BENEFITS UNDER THE PLAN.
>
> EXECUTION OF THIS DOCUMENT INVOLVES THE WAIVER AND RELEASE OF VALUABLE RIGHTS.

The 1993 Plan was in effect on the date of Garcia's injury, and shortly thereafter he began receiving wage replacement and medical benefits as provided under the Plan.

---

[2] At the time Garcia signed the election form, voluntary pre-injury elections to participate in nonsubscribing employers' benefit plans, in lieu of exercising common-law remedies, were not prohibited under Texas law. See Lawrence, 44 S.W.3d at 554. Although the Labor Code was later amended to prohibit pre-injury waivers, "Lawrence remains the law for those claims ... brought by workers who both signed non-subscriber agreements and suffered injury before September 1, 2001." Storage & Processors, Inc. v. Reyes, 134 S.W.3d 190, 192 (Tex. 2004).

On February 16, 2001, LumaCorp instituted a new benefit plan, the Occupational Injury Benefit Plan ("the New Plan"), which expressly revoked and terminated the 1993 Plan, retroactively effective December 1, 2000. Among other things, the New Plan increased the aggregate amount of benefits available to an eligible employee for a work-related injury from $100,000 to $1,000,000. Then-current employees were not required to sign any additional documents to become covered under the New Plan in place of the terminated 1993 Plan. Garcia continued to receive medical and wage replacement benefits under the 1993 Plan, however, because his injury had occurred prior to the effective date of the New Plan. As interpreted by LumaCorp, the 1993 Plan — and not the New Plan — still covered Garcia's injury.

By April 2001, Garcia's medical bills surpassed the $100,000 maximum benefit allowed under the 1993 Plan. Shortly thereafter, LumaCorp received a letter from its third-party administrator stating that the policy limit had been exceeded as to Garcia and that no further reimbursements would be made without preapproval of the insurer.[3] By this time, LumaCorp had already paid additional

---

[3] Administration of benefits under the 1993 Plan was as follows: LumaCorp paid for Garcia's medical services, and then submitted the invoices to its third-party administrator, Providence Risk & Insurance Services, for a determination of coverage. Once coverage was determined, Providence Risk forwarded the invoices to Reliance National, the insurance provider selected by LumaCorp to secure payment of benefits, for subsequent reimbursement to LumaCorp.

medical bills for which it had not been reimbursed, and Garcia had outstanding medical bills in the amount of $14,441.96.

On October 23, 2001, LumaCorp President and Plan Administrator James R. Mattingly, together with two other LumaCorp employees, went to the Garcias' home and tendered an instrument titled "Settlement Agreement and Release and Compromise of Claims" (the "Settlement Agreement"). It was written entirely in English. Mattingly explained the terms of the Settlement Agreement, including the release language, and informed Garcia that he had exhausted his benefits under the 1993 Plan. Mattingly further communicated LumaCorp's offer to pay Garcia's then-outstanding $14,441.96 in medical bills (which were in excess of the maximum benefit and for which LumaCorp would not receive reimbursement) plus an additional $10,000, if he would sign the Settlement Agreement. Rick Moncibais, LumaCorp's Director of Service, was also present and translated this information to the Garcias in Spanish. Garcia signed the Settlement Agreement, releasing LumaCorp from all claims arising out of his injury, in exchange for which LumaCorp paid all his outstanding medical bills as well as the additional $10,000.

On November 6, 2002, the Garcias filed suit in the district court, alleging claims of gross negligence, loss of consortium, fraud and fraud in the inducement, intentional infliction of emotional distress, race discrimination under 42 U.S.C. § 1981, public policy violations, wrongful termination, breach of fiduciary

5

duty under ERISA and common law, breach of contract, and failure of consideration. They also sought a declaratory judgment to compel arbitration.

In a final order dated July 24, 2004, the district court (1) denied the Garcias' motion for partial summary judgment, (2) granted summary judgment in favor of LumaCorp on all claims, and (3) dismissed the action with prejudice. The Garcias appeal all rulings of the district court, asserting eleven points of error in their brief.

## II. STANDARD OF REVIEW

We review a district court's findings of fact for clear error and its conclusions of law, including contractual interpretations, de novo.[4] We also review de novo a district court's grant of summary judgment.[5]

## III. ANALYSIS

Having carefully reviewed the evidence in the record and considered the arguments presented in the briefs and at oral argument, we conclude that Garcia waived all causes of action as well as his right to sue LumaCorp for work related injuries when he signed the voluntary election form to participate in the 1993 Plan. We further conclude that Garcia's coverage under the 1993 Plan was

---

[4] Marquette Transp. Co. v. La. Mach. Co., 367 F.3d 398, 402 (5th Cir. 2004).

[5] Armstrong v. City of Dallas, 997 F.2d 62, 65 (5th Cir. 1993).

unaffected by LumaCorp's adoption of the New Plan and termination of the 1993 Plan, and that the original waiver still stands. Moreover, the parties' valid settlement agreement independently released LumaCorp from all claims. We therefore affirm all rulings of the district court.

A.  Coverage under the 1993 Plan; waiver of right to sue.

In their appellate brief the Garcias assert that because LumaCorp revoked and terminated the 1993 Plan when it instituted the New Plan, "Mr. Garcia was therefore (1) either covered by the new Plan or (2) not covered by any Plan at all."  They argue further that "[b]ecause LumaCorp failed and refused to provide Mr. Garcia with the information notifying him of the right to elect under the second plan ... Mr. Garcia was in all probability, not covered by *any* plan and therefore is not barred from his common law right to sue."

The district court did not err in determining that Garcia was covered by the 1993 Plan at the time of his injury.  The summary judgment evidence shows that (1) Garcia signed an election form on August 17, 1998, to participate in the 1993 Plan, which was still in effect on the date of his injury; and (2) despite revocation and termination of the 1993 Plan, benefits would continue to be paid for work-related employee injuries that had occurred prior to termination of the 1993 Plan.

7

The New Plan did not cover Garcia's injury because it occurred prior to the New Plan's effective date. Specifically, subsection 2.15(ii) of the New Plan excluded from the definition of covered injuries any pre-existing conditions, defined in subsection 2.25 as "any illness, injury, disease, or other physical or mental condition, whether or not work-related, which originated or existed prior to the date of Accident or Occurrence [covered under the New Plan]." Mattingly, as Plan Administrator vested with "the sole and absolute discretionary power and authority to construe and interpret the Plan" under subsection 6.3, interpreted these provisions as limiting coverage under the New Plan to injuries occurring on or after December 1, 2000. "[W]hen an employee benefit plan vests discretion in the administrator, principles of trust law require that we leave the plan administrator's interpretation undisturbed if reasonable."[6] Considering the plain language of subsections 2.15(ii) and 2.25, quoted above, Mattingly's interpretation of the New Plan's coverage was reasonable.

Although subsection 11.13 of the New Plan expressly revoked and terminated the 1993 Plan, Mattingly did not interpret this provision to mean that benefits payable under the 1993 Plan for an injury covered by that Plan would be terminated. Rather,

---

[6] Schadler v. Anthem Life Ins. Co., 147 F.3d 388, 397 (5th Cir. 1998) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989)).

8

unexhausted benefits would continue to be paid under the 1993 Plan until the participant's eligibility ended according to the terms of that plan:

> Benefit Entitlement Period begins on the day the participant suffers a Work-Related Injury, and ends on the earlier of (1) the date the Approved Treating Physician determines that no further medical treatment is necessary or advisable; (2) the date the Participant's employment is terminated for cause; or (3) the date of the Participant's death.

We conclude that Mattingly's interpretation of this provision was reasonable. LumaCorp's revocation and termination of the 1993 Plan did not affect Garcia's entitlement to benefits for his injury, which occurred while that Plan was in effect.[7] The district court did not err in determining that the 1993 Plan — and not the New Plan — covered Garcia's injury.

B. Validity of the Settlement Agreement; validity of its release of all claims.

The Garcias challenge the Settlement Agreement on grounds of inadequacy of consideration and coercion. Neither of these complaints has merit.

The Garcias first argue that "[t]he October 23, 2001 Release ... upon which LumaCorp rely [sic] was predicated upon the

---

[7] We note that Mattingly did not give effect to a provision that "coverage will terminate at the same time the Injury Plan is terminated," and thereby avoided breaching his fiduciary duty not to eliminate vested benefits. See Izzarelli v. Rexene Prods. Co., 24 F.3d 1506, 1524 (5th Cir. 1994)(employer generally may modify or discontinue non-vested benefits without violating fiduciary duty under ERISA) (citing Wise v. El Paso Natural Gas, 986 F.2d 929, 937 (5th Cir. 1993)).

existence of [the 1993 Plan] which had been revoked almost nine months prior ... to the date of the Release itself. The Release is therefore void and fails as consideration for the Agreement." This assertion makes little sense, but even taking the argument at face value, it is not clear how the release "was predicated upon the existence of" the 1993 Plan. The summary judgment evidence shows that Mattingly explained to Garcia that he had long since exhausted his benefits under the 1993 Plan. The release was based on LumaCorp's offer to pay Garcia's then-outstanding medical bills plus an additional $10,000, all of which was independent of the 1993 Plan and well in excess of its maximum benefits.

The district court, noting that the Garcias apparently confused the issue of failure of consideration with that of adequacy of consideration, addressed whether they raised a genuine issue of material fact as to adequacy. The court did not err in granting summary judgment for LumaCorp on this issue. As the Garcias acknowledge in their brief, for consideration to be deemed inadequate under Texas law, "it must be so grossly inadequate as to shock the conscience, being tantamount to fraud."[8] The district court correctly found that Garcia was in fact paid more than he was entitled to receive under the 1993 Plan, and that LumaCorp was under no obligation to pay him anything at all once the Plan benefits were exhausted. LumaCorp's offer to pay Garcia's then-

---

[8] <u>Martin v. Martin, Martin & Richards</u>, 12 S.W.3d 120, 125 (Tex. App.——Fort Worth 1999, no pet.) (citation omitted).

outstanding medical bills —— in excess of $14,000 —— plus an additional payment of $10,000, in exchange for the release was surely not "so grossly inadequate as to shock the conscience."

The Garcias devote the remainder of their second point of error to their contention that LumaCorp coerced Garcia to sign the release. They allege coercion based on LumaCorp's having "descend[ed] upon the home of Mr. Garcia *en masse*. ... with a check in hand, admittedly making verbal representations which were not included in the Release ... and with no document in Spanish." They further argue that "[t]he actions of LumaCorp rise to the level of economic duress. ... It's [sic] acts of coercing Mr. Garcia to sign the Release was a [sic] economic duress which voided the terms of the release."

Yet, the Garcias did not present, and do not direct our attention to, any record evidence whatsoever to support these assertions. As they recognize in their brief, "we will uphold a grant of summary judgment where the nonmovant is unable, in turn, to point to any evidence in the record that would sustain a finding in the nonmovant's favor on any issue on which he bears the burden of proof at trial."[9] The only potential record sources of support for the Garcias' claims are their personal affidavits, which state generally, "I have had the Plaintiff's Answer to Defendant's Motion for Summary Judgment translated to me from English into Spanish ...

---

[9] <u>Carson v. Dynegy, Inc.</u>, 344 F.3d 446, 451 (5th Cir. 2003) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)).

and I understand what was read to me, to the best of my ability. Each statement herein is within my personal knowledge, true and correct." These affidavits, even when read in conjunction with the referenced Plaintiff's Answer, are insufficient to establish the existence of a genuine issue of material fact. All we have are the Garcias' unsubstantiated assertions. "Needless to say, unsubstantiated assertions are not competent summary judgment evidence."[10] The district court did not err in finding that the Garcias' allegations of coercion were unsupported by competent summary judgment evidence. The Settlement Agreement was valid and enforceable.

## IV. CONCLUSION

As we agree with the conclusions of the district court that (1) Garcia was covered under the 1993 Plan in which he expressly waived all causes of action and his right to sue, and (2) the parties' Settlement Agreement is valid and constitutes an independent release of all claims, we need not address the Garcias' other asserted points of error. The district court's grant of summary judgment in favor of LumaCorp on all claims, and all rulings of the district court in this matter, are, in all respects, AFFIRMED.

---

[10] Abbott v. Equity Group, Inc., 2 F.3d 613, 619 (5th Cir. 1993) (citing Celotex, 477 U.S. at 324).

12