# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 13, 2013

Lyle W. Cayce
Clerk

No. 12-20517

SPRING STREET PARTNERS - IV, L.P.,

Plaintiff-Appellee,

v.

LONG K. LAM; EN KHA LAM; TEN LAM; VINH NGO,

Defendants-Appellants.

Appeals from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, and HIGGINBOTHAM and JONES, Circuit Judges.

CARL E. STEWART, Chief Judge:

Defendants-Appellants Long K. Lam, En Kha Lam, Ten Lam, and Vinh Ngo appeal from the district court's summary judgment in favor of Plaintiff-Appellee Spring Street Partners - IV, L.P. on its claims for fraudulent transfer and piercing the corporate veil of a limited liability company. We AFFIRM IN PART and VACATE AND REMAND IN PART.

## I. FACTS AND PROCEDURAL HISTORY

### A.     The Financial Obligations

Between 2001 and 2005, Bayou City Fish Company, also known as Bayou City Fish, Inc. ("Bayou"), incurred debt to SouthTrust Bank, N.A. ("SouthTrust

Bank"). The most significant of these obligations was a promissory note for a revolving line of credit that eventually grew to the amount of $8.5 million. The revolving credit note had a maturity date of May 31, 2006. The remainder of the Notes had a collective principal amount of approximately $1.2 million with various maturity dates. Douglas Lam, who was the sole owner of Bayou, personally guaranteed the promissory notes ("Notes") for all of this debt.

In May 2006, the $8.5 million in Notes matured and became due and payable. However, Bayou and Douglas Lam failed to make any payments. Thus, on November 10, 2006, Wachovia sent Bayou and Douglas Lam a "Notice of Default and Intent to Accelerate" the Notes ("Default Notice").

On December 11, 2006, Wachovia sold the Notes to Spring Street at a private auction. In January and February of 2007, Spring Street sent at least three (3) demand letters to Bayou and/or Douglas Lam.

**B.     The Lam Entities**

*1.     Bayou*

In 1994, Bayou began operating as a retail and wholesale seafood distributor. From the beginning and through at least 2004, Douglas Lam's sister, Ten Lam, worked for Douglas at Bayou as a sales representative, and Ten Lam's husband, Vinh Ngo, worked in the warehouse.

Bayou operated its business out of two locations on the same street in Houston, Texas: 213 East Hamilton Street (wholesale operations), and 415 East Hamilton Street (retail operations).

According to Ten Lam and Ngo, Brian Shernak ("Shernak"), a Bayou employee who was responsible for bringing in a significant amount of sales from supermarket chains, constantly advised Douglas Lam that he should fire Ten Lam and Ngo. Shernak also repeatedly advised Douglas Lam to sell the retail operation located at 415 East Hamilton because it was too much work and not profitable, and selling the retail business likely would cause Bayou's wholesale

business to increase. Douglas Lam found Shernak's advice persuasive because of his record of increasing Bayou's sales. Ten Lam and Ngo also periodically requested that Douglas Lam sell them Bayou's retail operation. Finally, in late 2004 or early 2005, Douglas Lam agreed to sell the retail business, which was spun off into what would become LT Seafood, L.P. ("LT Seafood").

### 2.     *LT Seafood*

In February 2005, Ten Lam and Douglas Lam formed LT Seafood. At the time of LT Seafood's formation, Douglas Lam owned 49%, Ten Lam owned 50%, and an entity that Ten Lam owned–LT Seafood Management, L.L.C.–owned 1%.

After the Lams formed LT Seafood, the restaurant began operating out of 415 East Hamilton Street, although Bayou continued to use that location as its address as late as August 2007.

According to Ten Lam and Ngo, a staffer from Bayou was in charge of moving out Bayou's property from 415 East Hamilton, and this staffer indicated that everything was removed other than "some furniture and computers that were so old that they were abandoned, an ice machine that was fixed to the structure, and some old trucks that Bayou had replaced in service." Employees of Bayou who still worked at 415 East Hamilton moved to Bayou's other location at 213 East Hamilton.

At some point, Wachovia declined to lend Bayou any more money unless it increased its assets. Thus, for a period of time after the Lams created LT Seafood, Bayou submitted borrowing base certificates to Wachovia which combined the assets, finances, receivables, and inventory of LT Seafood and Bayou in order to guarantee that the bank would continue to extend credit to Bayou. Douglas Lam has asserted that Wachovia suggested that the entities combine their assets in this manner.

### 3.     *DKL&DTL*

On November 20, 2006–ten days after Wachovia sent the Default Notice to Bayou and Douglas Lam–Douglas Lam formed the LLC, DKL&DTL, with his wife, Diane Lam, and two of his siblings, Long K. Lam ("Long Lam") and En Kha Lam ("En Lam").

### 4. *Other Relevant Lam Entities*

In 2001, Douglas Lam formed Wells Star Group, Inc. ("Wells Star"). This entity is involved in some of the transactions that Ten Lam and Ngo allege relate to their purchase of Douglas Lam's 49% interest in LT Seafood, discussed *infra*.

In May 2007, Ten Lam formed JNT Group, LLC, and served as its sole member, manager, and president. JNT also was involved in the sale of 415 East Hamilton, discussed *infra*.

## C. The Transfers of Assets

As relevant to the issues on appeal, Spring Street charges that three particular transfers were fraudulent: (1) Bayou's transfer of "hard assets" to LT Seafood when LT Seafood took over Bayou's retail operations at the 415 East Hamilton location; (2) Douglas Lam's transfer of his 49% interest in LT Seafood to DKL&DTL; and (3) DKL&DTL's subsequent transfer of this 49% interest to Ngo. Douglas Lam testified in deposition that, as a result of these transfers, he has had no source of income and has paid his daily expenses by relying on his wife and using credit cards.

### 1. *Bayou's Transfer of "Hard Assets" to LT Seafood*

Ten Lam and Ngo assert that LT Seafood agreed to pay $12,000 per month to lease the 415 East Hamilton location, and LT Seafood eventually paid a total of $363,000 under this arrangement. They assert that the property that Bayou "abandoned" when it left the 415 East Hamilton location was included in the lease, and was worth, at most, $50,000. They also maintain that LT Seafood paid for the inventory Bayou left at the location, and for various other items, such as insurance, maintenance, and repairs. Accordingly, Ten Lam and Ngo

No. 12-20517

assert that, between 2005 and early 2007, LT Seafood overpaid Bayou by $73,729.78 for these various items.

Meanwhile, Spring Street asserts that Bayou transferred property in the form of "hard assets," with an estimated value of $150,000, to LT Seafood when LT Seafood was formed. These hard assets included trucks and computers, among other things.

### 2. *Douglas Lam's Transfers to DKL&DTL*

In December 2006, Douglas Lam transferred his interests in the following entities to DKL&DTL[1]:

a. 49% interest in LT Seafood
b. Port Arthur Camellia Estate, L.P.
c. Camellia Plaza, L.P.
d. DHL Development, L.P.
e. DHL International, L.P.
f. Sea Farm Enterprise, L.P.
g. VLC Kuykendahl Venture, L.P. ("VLC Kuykendahl Venture")

Douglas Lam received no consideration from DKL&DTL for any of these transfers. Rather, he testified in deposition that he set up DKL&DTL to protect the interests of his mother and children, and that he effectuated the foregoing transfers as a "gift" to them.

Douglas Lam has stated that out of the 28 or more companies he owned, only four have been profitable since 2005, including LT Seafood, Bayou, VLC Kuykendahl Venture, and Wells Star.

### 3. *DKL&DTL's Transfer of the 49% Interest in LT Seafood to Ngo*

In November 2007, DKL&DTL subsequently transferred the 49% interest in LT Seafood to Ngo.

---

[1] We will refer to the limited partnerships listed collectively as "the Limited Partnerships" herein, not including LT Seafood.

Ten Lam and Ngo assert that Ngo paid Douglas Lam for this 49%. They maintain that, in November 2007, they purchased the 415 East Hamilton location and the 49% interest in LT Seafood in a single transaction. Ten Lam and Ngo maintain that they obtained $1 million in financing from Golden Bank, and borrowed approximately $250,000 from friends and family to finance this single transaction. Ten Lam and Ngo further assert that the 415 East Hamilton property was only worth about $600,000. Additionally, according to Randall Joe Mayer, the accountant who reviewed LT Seafood's financial statements to determine its value, this 49% interest was worth approximately $382,000. Therefore, by subtracting $600,000 from $1.25 million, Ten Lam and Ngo assert that Ngo paid Douglas Lam $625,000 for the 49% interest in LT Seafood, while the true value of this interest was much less ($382,000).

Spring Street asserts that there is no competent evidence demonstrating that Ngo paid for this interest. It maintains that all of the evidence Tem Lam and Ngo rely on demonstrate a real estate purchase between an entity that Douglas Lam controlled, Wells Star, and an entity that Ten Lam controlled, JNT, and that neither DKL&DTL nor Ngo were involved in this transaction.

## D.     Procedural History

### 1.     Relevant District Court Proceedings

On January 8, 2008, Spring Street instituted this suit against Bayou and Douglas Lam to recover on the defaulted Notes. On April 23, 2009, Spring Street filed an amended complaint naming as additional defendants DKL&DTL, LT Seafood, Ten Lam, and Ngo. In this amended complaint, Spring Street brought additional claims for: 1) single business enterprise / joint venture / joint enterprise / partnership against LT Seafood and Bayou; and 2) fraudulent transfers under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), Tex. Bus. & Comm. Code §§ 24.005(a)(1), 24.005(a)(2), and 24.006, against DKL&DTL, LT Seafood, Ten Lam, and Ngo. On December 21, 2009, the district

No. 12-20517

court granted Spring Street's motion for interlocutory, partial summary judgment on Douglas Lam's guaranties, holding him personally liable for the Notes. While Douglas Lam filed a motion for a "new trial," which the district court denied, he has not appealed the district court's summary judgment finding him personally liable for the $8.5 million note, among other debt.

On February 3, 2010, LT Seafood, Ten Lam, and Ngo filed a motion for summary judgment on Spring Street's claims for: 1) fraudulent transfers, 2) single business enterprise, and 3) partnership / joint venture principles. On February 26, 2010, Spring Street filed an opposition to this motion for summary judgment, and it filed its own cross-motion for summary judgment on its claims for fraudulent transfers. Various defendants also filed counter-claims against Spring Street.

In DKL&DTL's March 26, 2010 response to Spring Street's motion for summary judgment, it stated for the first time that its corporate charter had expired seven (7) months earlier, on August 7, 2009, due to its failure to file an annual tax report with the state of Texas. DKL&DTL asserted that Spring Street's action against it thus "appear[ed] to be moot." In response, Spring Street obtained leave of the court to file a Second Amended Complaint naming all of the individual DKL&DTL members as additional defendants–Long Lam, En Lam, and Diane Lam, who were co-owners of DKL&DTL with Douglas Lam. Spring Street filed this Second Amended Complaint on October 26, 2010.

In its summary judgment opinion on December 17, 2011, and its amended final judgment on March 12, 2012, the district court made the following pertinent rulings on summary judgment:

> 1. LT Seafood is jointly liable for the nearly $8 million debt (plus post-judgment interest), as it had "represent[ed] to Wachovia that it and Bayou were the same entity by combining their financial statements and maintaining the same address."

7

No. 12-20517

2. The following defendants are jointly and severally liable to Spring Street for $382,000[2] (plus post-judgment interest) for fraudulent transfers relating to the 49% interest in LT Seafood:
  1. DKL&DTL
  2. Douglas Lam
  3. Diane Lam
  4. En Lam
  5. Long Lam
  6. Ngo

3. Ten Lam and Ngo are jointly and severally liable to Spring Street for $150,000 (plus post-judgment interest) for the fraudulent transfer of the hard assets from Bayou to LT Seafood.

4. DKL&DTL must transfer back to Douglas Lam its interests in the following entities:
  1. Port Arthur Camellia Estate, L.P.
  2. Camellia Plaza, L.P.
  3. DHL Development, L.P.
  4. Sea Farm Enterprise, L.P.
  5. VLC Kuykendahl Venture

The district court subsequently denied various defendants' motions for a "new trial," and it dismissed all counterclaims that the parties had filed.

On behalf of themselves only, *i.e.*, not on behalf of their various entities, Long Lam and En Lam, jointly, and Ten Lam and Ngo, jointly, appeal.

*2.     Relevant Bankruptcy Court Proceedings for Bayou*

On August 30, 2008, Bayou filed a voluntary Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Southern District of Texas (the "bankruptcy court"). Ronald J. Sommers (the "Trustee") was

---

[2] For the purposes of calculating damages on summary judgment, Spring Street stipulated that the 49% interest in LT Seafood was $382,000, the amount that LT Seafood's expert determined.

appointed as the trustee of Bayou's bankruptcy estate. The Trustee later intervened as a plaintiff in the instant suit because some of Spring Street's causes of action became the property of Bayou's bankruptcy estate, subject to the exclusive control of the Trustee. On June 2, 2011, the bankruptcy court approved a settlement between the Trustee and Spring Street under which the Trustee assigned all of the bankruptcy estate's claims to Spring Street. *See In re Bayou City Fish, Inc.*, No. 08-35703 (Bankr. S.D. Tex. June 1, 2011) (Order Granting Trustee's Motion to Compromise with Spring Street). Bayou's bankruptcy case was then closed.

3.     *Spring Street's Dual Role in the Proceedings*

Due to the parallel proceedings in the district court and in the bankruptcy court, it is helpful to keep in mind that Spring Street thus "wear[s] two hats" in this litigation: 1) creditor for Douglas Lam, and 2) successor-in-interest to the bankruptcy Trustee. First, as a creditor for Douglas Lam, who is personally liable for the $8.5 million Note, Spring Street is asserting a right to the 49% interest in LT Seafood that Douglas Lam transferred to DKL&DTL. As noted, DKL&DTL then transferred this interest to Ngo. Second, as the successor-in-interest to the Bayou bankruptcy Trustee, Spring Street seeks the value of the assets that Bayou transferred to LT Seafood.

**II.**

We review a district court's grant of summary judgment de novo, applying the same standards as the district court. *Garcia v. LumaCorp, Inc.*, 429 F.3d 549, 553 (5th Cir. 2005) (citations omitted). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is material if its resolution could affect the outcome of the action." *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001) (citation omitted). "In deciding whether a fact issue has been created, the

court must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Id.* (citation omitted). "We resolve factual controversies in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).

## III.

Defendants-Appellants raise three sets of challenges to the district court's summary judgment in Spring Street's favor. First, Long Lam and En Lam argue, as a threshold matter, that the district court erred by entering judgment against them without prior notice or an opportunity to respond to Spring Street's motion. Second, all Appellants challenge their liability on Spring Street's fraudulent transfer claims. Third, Long Lam and En Lam argue that the reinstatement of DKL&DTL's corporate charter precludes finding them individually liable for the fraudulent transfers due to Spring Street's piercing of the corporate veil. We address each set of challenges in turn.

A.     **The District Court's "*Sua Sponte*" Summary Judgment Against Long Lam and En Lam**

Long Lam and En Lam argue on appeal that the district court committed reversible error by entering summary judgment against them because they were added as individual defendants after the parties had filed their respective motions for summary judgment, and the parties conducted no additional discovery. Spring Street had added Long Lam and En Lam as defendants in its Second Amended Complaint on October 26, 2010 after DKL&DTL asserted that the lapse in its corporate charter precluded Spring Street from suing the LLC as an entity. This amended complaint was filed eight months after the pre-existing parties filed their respective summary judgment motions in February 2010. There were no renewed motions for summary judgment after Long Lam and En

No. 12-20517

Lam were added to the suit; the defendants only filed answers to the Second Amended Complaint. Without prior notice of its intent to do so as to Long Lam and En Lam, the district court ruled in Spring Street's favor on the motions for summary judgment over a year after the motions were filed, in December 2011.

Federal Rule of Civil Procedure 56 provides, in part, that "[a]fter giving notice and a reasonable time to respond, the court may . . . grant the motion on grounds not raised by a party[] or . . . consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f)(2)–(3). "We review for harmless error a district court's improper entry of summary judgment *sua sponte* without notice." *Atkins v. Salazar*, 677 F.3d 667, 678 (5th Cir. 2011) (citations omitted).

We conclude that, even if the district court erred by granting summary judgment against Long Lam and En Lam without prior notice or an opportunity to respond, they have waived this argument by failing to pursue it before the district court. *See Celanese Corp. v. Martin K. Eby Constr. Co., Inc.*, 620 F.3d 529, 531 (5th Cir. 2010) (citation omitted). At the January 25, 2012 hearing during which the district court sought to ascertain the value of the various interests for Spring Street's judgment, Long Lam and En Lam lodged no objection to their lack of notice of the district court's summary judgment ruling. They subsequently filed a motion for a new trial in which they objected to the court's conclusion that they were individually liable in spite of the reinstatement of DKL&DTL's corporate charter, and to Spring Street's ability to pierce the corporate veil of DKL&DTL. They lodged no objection to their lack of advance notice of the district court's summary judgment. Moreover, Long Lam and En Lam had several opportunities following the summary judgment ruling to raise this issue and contest their liability generally during subsequent proceedings below; thus any error was harmless. *See Atkins*, 677 F.3d at 678 (citations

11

omitted). We therefore decline to reverse the district court's judgment on this basis.

## B.    Spring Street's Fraudulent Transfer Claims

In its Second Amended Complaint, Spring Street brought claims against Long Lam, En Lam, Ten Lam, and Ngo for what it alleges were fraudulent transfers by which Douglas Lam and Bayou placed assets outside of their creditors' reach. As we have noted, three transfers, involving two assets, are at issue on appeal.[3] As to the first transfer, Long Lam and En Lam's liability arises from their partial ownership of DKL&DTL, to which Douglas Lam transferred his 49% interest in LT Seafood. Regarding the second transfer, DKL&DTL subsequently transferred this 49% interest in LT Seafood to Ngo. This second transfer is one of the two bases for Ngo's liability. As to the third transfer, Spring Street has asserted claims against Ten Lam and Ngo based on their joint ownership of LT Seafood and Bayou's "transfer" of $150,000 worth of "hard assets" to LT Seafood.

Accordingly, after outlining the applicable law relating to fraudulent transfers, we address each of these transfers in turn.

### 1.    Applicable Law

In general, a determination of liability under TUFTA is a two-step process: first, a finding that a debtor committed an actual, fraudulent transfer, TUFTA § 24.005(a)(1), or a constructive, fraudulent transfer, *id.* § 24.005(a)(2)); and, second, recovery of that fraudulent transfer, or its value, from the transferees, *id.* §§ 24.008–24.009.

The actual fraud prong provides:

> [a] transfer made or obligation incurred by a debtor is
> fraudulent as to a creditor, whether the creditor's claim

---

[3]    Neither the Lams nor DKL&DTL appeal the district court's order directing DKL&DTL to transfer back to Douglas Lam his prior interests in the Limited Partnerships.

> arose before or within a reasonable time after the
> transfer was made or the obligation was incurred, if the
> debtor made the transfer or incurred the obligation:
>
> (1) with actual intent to hinder, delay, or defraud any
> creditor of the debtor[.]

TUFTA § 24.005(a)(1).   TUFTA also supplies a "non-exclusive list of eleven factors, commonly known as 'badges of fraud,' that courts may consider in determining whether a debtor actually intended to defraud creditors under TUFTA."[4]   *In re Soza*, 542 F.3d 1060, 1066 (5th Cir. 2008) (citing TUFTA § 24.005(b)).

The constructive fraud prong states:

> [a] transfer made or obligation incurred by a debtor is
> fraudulent as to a creditor, whether the creditor's claim
> arose before or within a reasonable time after the
> transfer was made or the obligation was incurred, if the
> debtor made the transfer or incurred the obligation . . .
>
> (2) without receiving a reasonably equivalent value in
> exchange for the transfer or obligation, and the debtor:
>
>> (A) was engaged or was about to engage in
>> a business or a transaction for which the
>> remaining assets of the debtor were

---

[4]    Specifically, TUFTA provides that, "[i]n determining actual intent under [§ 24.005(a)(1)], consideration may be given, among other factors, to whether": (1) "the transfer or obligation was to an insider"; (2) "the debtor retained possession or control of the property transferred after the transfer"; (3) "the transfer or obligation was concealed"; (4) "before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit"; (5) "the transfer was of substantially all the debtor's assets"; (6) "the debtor absconded"; (7) "the debtor removed or concealed assets"; (8) "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred"; (9) "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred"; (10) "the transfer occurred shortly before or shortly after a substantial debt was incurred"; and (11) "the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." TUFTA § 24.005(b).

> unreasonably small in relation to the business or transaction; or
>
> (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TUFTA § 24.005(a)(2).

The statute further provides:

> [a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

*Id.* § 24.006(a).

TUFTA defines "reasonably equivalent value" as "includ[ing] without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." *Id.* § 24.004(d).

Among the remedies available to a creditor under the statute is "avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim." *Id.* § 24.008(a)(1). Subject to certain exceptions and to the extent a transfer is voidable, the creditor may recover the value of the asset transferred, and judgment may be entered against:

> (1) the first transferee of the asset or the person for whose benefit the transfer was made; or
>
> (2) any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee.

*Id.* § 24.009(b).  If the judgment is based upon the value of the transferred asset, "the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require."  *Id.* § 24.009(c)(1).

The statute also provides a good faith defense: "[a] transfer or obligation is not voidable . . . against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee."  *Id.* § 24.009(a).

Finally, the statute mandates that a creditor generally must bring an action to recover a transfer, or the value thereof, within four years of the transfer, subject to certain exceptions not relevant here.  *See id.* § 24.010(a)(1)–(2).

2.     *The Alleged Fraudulent Transfers at Issue on Appeal*

a.     Douglas Lam's Transfer of His 49% Interest in LT Seafood to DKL&DTL ($382,000)

Long Lam, En Lam, Diane Lam, and Douglas Lam created DKL&DTL ten days after Wachovia delivered its Notice of Default on the $8.5 million Note to Douglas Lam and Bayou.  Additionally, it is undisputed that Douglas Lam received no consideration in exchange for his transfer of his 49% LT Seafood interest to DKL&DTL two weeks after receiving the Notice of Default.  Instead, he transferred this interest purportedly as a "gift" to his mother and children.  The uncontroverted evidence thus supports the conclusion that this transfer is fraudulent as to Spring Street because Douglas Lam made the transfer "with actual intent to hinder, delay, or defraud" Spring Street.  TUFTA § 24.005(a)(1).  Notably, the transfer evidences several of the "badges of fraud," including:  the transfers were to insiders; Douglas Lam and Bayou received a threat of suit right before this transfer; and Douglas Lam retained partial control over the

entity receiving the transfer, *i.e.*, DKL&DTL, through his 25% ownership in the LLC. *See In re Soza*, 542 F.3d at 1066 (citing TUFTA § 24.005(b)).

Based on the foregoing, the district court's determination that Douglas Lam's transfer of his 49% interest in LT Seafood to the newly-formed DKL&DTL constituted a fraudulent transfer is AFFIRMED. As we discuss *infra*, this determination affects the liability of Long Lam and En Lam as two of the four owners of the LLC, in light of Spring Street's seeking to pierce the corporate veil of DKL&DTL to impose individual liability on its owners.[5]

> b.    DKL&DTL's Subsequent Transfer of the 49% Interest in LT Seafood to Ngo ($382,000)

Spring Street's theory of Ngo's liability as to this transfer is that he was a "subsequent transferee other than a good faith transferee"under TUFTA § 24.009(b)(2).

Ten Lam and Ngo essentially argue that there are genuine disputes of fact regarding whether Ngo is entitled to the good faith defense under TUFTA § 24.009(a). Specifically, they assert that Ngo paid for Douglas Lam's 49% interest in LT Seafood in the same transaction in which he and Ten Lam purchased the 415 East Hamilton property, for a total of $1.2 million. Ten Lam and Ngo assert that this property was only worth about $600,000, and they rely on Ngo's affidavit stating that the property was worth only about $600,000, and a document from the Harris County Appraisal District ("HCAD"), which reflects a property value of $552,000. Thus, Ngo avers that he paid Douglas Lam the difference between the $1.25 million and $600,000, or $625,000 for the 49% interest. Further, because the CPA estimated that this 49% interest was worth much less, *i.e.*, $382,000, Ten Lam and Ngo assert that Ngo *overpaid* for it.

---

[5] We do not address herein the liability of the other two owners of DKL&DTL–Douglas Lam and Diane Lam–since Douglas did not appeal the district court's judgment and Diane's appeal was dismissed for want of prosecution.

No. 12-20517

Douglas Lam likewise avers that the real estate transaction involving the sale of 415 East Hamilton included the sale of his 49% interest in LT Seafood to Ngo.

Importantly, the transactions that Ngo relies on to demonstrate that he paid consideration for the 49% interest actually reflect a transaction between an entity Ten Lam wholly owned, JNT, and an entity Douglas Lam owned, Wells Star. Ngo relies on: 1) an incomplete settlement statement, dated November 7, 2007, relating to the purchase of the 415 East Hamilton property, which identifies JNT as the borrower and Wells Star as the seller; 2) a promissory note from JNT to Golden Bank for the financing of the 415 East Hamilton property; and 3) a special warranty deed and vendor's lien which JNT granted in favor of Wells Star on the 415 East Hamilton property. Ngo has also relied on Wells Star bank records reflecting two payments from Ngo for $350,803, as well as various other checks from Ngo to Wells Star and others. The only document that actually reflects the transfer of the 49% interest in LT Seafood from DKL&DTL to Ngo, however, is the "Assignment of and Sale of Limited Partnership Interests" ("Assignment"), which recites "fair and valuable consideration in an amount not less than ten dollars." This document, which the DKL&DTL members signed in November 2007, does not reference any of the other aforementioned transactions.

We agree with the district court's conclusion that the promissory note, Wells Star bank statements, checks, and settlement statement:

> do not prove that [Ngo] paid [DKL&DTL] or that JNT paid Wells [Star] for the 49% interest. Rather, they establish that Golden Bank agreed to loan JNT $1 million for the purchase of the East Hamilton property and that JNT paid Wells [Star] $1.25 million for it. At most, this is a transaction between Douglass [sic], Ten [Lam], and [Ngo] to purchase the property [, *i.e.*, 415 East Hamilton].

Thus, based on the summary judgment evidence, Ngo has failed to raise a genuine dispute that he paid "reasonably equivalent value," or any value, in exchange for the 49% interest.

Alternatively, even if Ngo paid a "reasonably equivalent value" for the 49% interest, he is still not entitled to TUFTA protection because he was not a "good faith transferee." TUFTA § 24.009(b)(2). Ngo and Ten Lam are closely related to Douglas Lam and they are familiar business partners[6]; therefore, Ngo would have been aware of Douglas Lam's financial predicament and maneuvering tactics. Moreover, this transfer took place in the midst of Spring Street's attempts to collect on the $8.5 million Note. Spring Street's predecessor-in-interest, Wachovia, sent the first Notice of Default in November 2006, and Spring Street sent additional demands for payment in early 2007. Thus, certainly by November 2007, this debt was well overdue. As Douglas Lam was one of the four members of DKL&DTL who assigned the 49% interest to Ngo, Spring Street's fraudulent claim satisfies TUFTA's actual fraud prong–that Douglas Lam made the transfer "with actual intent to hinder, delay, or defraud" Spring Street. TUFTA § 24.005(a)(1). Several badges of fraud are apparent here as well, including the transfer to an insider; the lack of consideration paid for the transfer; the fact that Douglas Lam was without assets and essentially judgment-proof following the transfer; and the fact that DKL&DTL failed to disclose the transfer for over a year during this litigation. *See In re Soza*, 542 F.3d at 1066 (citing TUFTA § 24.005(b)).

We therefore conclude that Spring Street should prevail on its fraudulent transfer claim as to this particular transfer, as Ngo has raised no genuine

---

[6] In fact, the district court concluded that Ten Lam and Ngo operated LT Seafood as essentially the same entity as Douglas Lam's Bayou, a ruling that neither they nor LT Seafood has appealed.

dispute of material fact either that he paid consideration for the interest or that he was a good faith tranferee.

        c.     Bayou's Alleged Transfer of Hard Assets to LT Seafood/ Ten Lam and Ngo ($150,000)

We conclude, as a matter of law, that Spring Street has failed to carry its burden of demonstrating that Ten Lam and Ngo are jointly and severally liable for $150,000 as the value of the hard assets that Bayou allegedly transferred to LT Seafood.

Spring Street contends that Ten Lam and Ngo are liable under TUFTA § 24.009(b)(1), which permits recovery from "the first transferee of the asset or the person for whose benefit the transfer was made." Specifically, according to Spring Street, Douglas Lam transferred assets from Bayou to LT Seafood. At that time, Ten Lam was the majority owner of LT Seafood. By November 2007, Ngo had taken ownership of the remaining 49% share of LT Seafood, via "a two-step fraudulent transfer through DKL&DTL." Spring Street argues that the district court properly found that the transfer of Bayou's hard assets to LT Seafood was made for the benefit of Ten Lam and Ngo as joint owners of the entity. *Id.* Notably, Spring Street pursues this transfer as the successor-in-interest to the bankruptcy Trustee.

Ten Lam and Ngo argue that the district court erred in determining that they were jointly and severally liable for the value of Bayou's "hard assets" that were "transferred" to LT Seafood despite the existence of genuine fact issues as to 1) the value of the subject property, 2) the question of whether the property actually was transferred to LT Seafood, and 3) the question of whether LT Seafood's overpayment to Bayou compensated Bayou for the property. Specifically, Ten Lam and Ngo assert that the "hard assets" Spring Street refers to actually was "abandoned property" that was included in the lease for the 415 East Hamilton location, in the amount of $12,000 per month. They further

argue that Spring Street has failed to show how they personally were the beneficiaries of the transfer.

The district court rejected Ten Lam and Ngo's claim that they paid value for Bayou's assets through LT Seafood's rental payments to Wells Star for the use of Bayou's former site at 415 East Hamilton, or through checks LT Seafood wrote for inventory purchases from Bayou. Importantly, Ten Lam and Ngo's contention also appears to contradict the Trustee's declaration and exhibit relating to the transfer of assets from Bayou to LT Seafood, which the Trustee produced in consultation with Douglas Lam and Bayou's controller, Glen Huang. [*See* **R. 1323–26.**] In the declaration, the Trustee states as follows:

> I questioned Mr. Lam and Mr. Huang in detail about [the Debtor, Bayou's] relationship with LT Seafood. I requested that [Bayou] produce to me a listing of all "hard" assets transferred by [Bayou] to LT Seafood with the four years prior to the filing of the Bankruptcy Case, including any consideration paid by LT Seafood to [Bayou] in exchange for those assets.

[**R. 1323.**] Attached to this declaration was an exhibit itemizing these hard assets and reflecting a value of approximately $150,000. The exhibit also showed no consideration flowing from LT Seafood to Bayou. [*See* **R. 1326.**] Among these assets were several trucks, with an estimated total value of $83,672; computers and related equipment with an estimated value of $7,258; an ice machine with a value of $54,931; miscellaneous other equipment valued at $2,300; office furniture and equipment valued at $4,036; and a "sliding door" with a value of $805. The trucks were valued at their original costs, with purchase dates between 2002 and 2005. This aforementioned document is the basis for the $150,000 for which the district court found Ten Lam and Ngo to be jointly and severally liable.

Below and on appeal, Ten Lam and Ngo have challenged the admissibility and reliability of this exhibit as sufficient to prove their liability to Spring Street

as a matter of law.  Specifically, in response to Spring Street's motion for summary judgment below, Ten Lam and Ngo "ask[ed] the Court to strike" the exhibit, as they "object[ed] to this document for its hearsay character, its internal contradictions and its unsupported opinion of ownership and values." [**R. 1383**].  They highlighted the fact that the document does not demonstrate the existence of any liens on the vehicles or equity, and no titles for any of the vehicles were produced.  They also pointed out that the document indicates Bayou acquired the 2000 Nissan UD on April 21, 2005, but that the document shows that the transfers to LT Seafood were made on March 7, 2005, *before* Bayou would have had acquired this vehicle. [***Id.***].  Additionally, Ten Lam attested to contrary value and ownership of these items.  In her affidavit, she opines that "the values of these items is [sic] much lower than what they originally cost":

> For example, the furniture, office equipment, and computers were in fair condition, at best, as were the forklift, scales, and pallet jacks and refrigerator.  The trucks had high mileage and required frequent repairs. . . . Together, in my opinion, all of these items did not exceed $50,000 in value in the Spring of 2005.  The ice machine is mentioned on Plaintiff's Exhibit was a built-in unit that was attached to the ceiling.  To remove it would have destroyed it.

[**R. 1404**]

Spring Street's sole reliance on this document to prove both the fact that assets were transferred and their value is problematic.  For example, if Ten Lam's assertion is correct that the ice machine constituted a fixture to the 415 East Hamilton property, then the value of this machine, which is not insignificant, may have been improperly included in the $150,000 figure.  Further, the exhibit indicates the original cost of the enumerated items, which were acquired years before the alleged transfer in some cases.  Thus, Spring

Street has not proffered values of these assets on the date of the transfer. *See* TUFTA § 24.009(c)(1) ("[T]he judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require."). While Ten Lam's affidavit is arguably "self-serving," as Spring Street contends, it is based on her personal knowledge of the items she used for her business.[7]  On the other hand, the Trustee merely attests to the fact that Bayou provided the estimated costs to him; thus, the exhibit itself likely would constitute inadmissible hearsay. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Moreover, Ten Lam and Ngo rely on personal property records from the Harris County Appraisal District showing that at least two of the vehicles itemized in the exhibit were taxed to Bayou on December 31, 2005, *after* the alleged transfer to LT Seafood earlier that year. [*See* **R. 1383, 1494-99**].

Our detailed record review of the summary judgment record fails to reveal any determinative piece of evidence that corroborates Spring Street's assertion that it is entitled to the $150,000 based on the exhibit. Construing the facts in the light most favorable to the non-movants–Ten Lam and Ngo–we conclude that Ten Lam's contrary attestation and supporting submissions, combined with the lack of contemporaneous values of the assets in the exhibit, render  summary

---

[7] *See* Daniel R. Coquillette et al., Moore's Federal Practice § 56.94[3], at 56-225 (3d ed. 2013) ("Affidavits or declarations of parties that set forth only conclusory and unsupported assertions are sometimes described disparagingly as 'self-serving' affidavits, as if the 'self-serving' nature of a document renders it automatically insufficient.  However, there is nothing wrong with self-serving affidavits and declarations, provided they are supported by the facts in the record[.]" (footnote and citations omitted)).

judgment in Spring Street's favor on this claim inappropriate. We therefore conclude that Ten Lam and Ngo have a raised a genuine dispute of fact as to both which "hard assets" Bayou transferred to LT Seafood and the value of those assets on the date of the transfer. Accordingly, we VACATE the district court's judgment against these defendants on this basis, and REMAND for further proceedings.

## IV.

### A.     May Spring Street Pierce the Corporate Veil of DKL&DTL and Sue Individual LLC Members?

As we have determined that both Douglas Lam's transfer of his 49% interest in LT Seafood to DKL&DTL and and DKL&DTL's subsequent transfer of that interest to Ngo constituted fraudulent transfers, we now address Spring Street's attempt to pierce the corporate veil of DKL&DTL to hold its owners individually liable, on a joint and several basis, for the value of these transfers, *i.e.*, $382,000.

#### 1.     *Limited Liability of Corporations and LLCs*

Under Texas law, the shareholder of a corporation,

> may not be held liable to the corporation or its obligees with respect to . . . any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory[.]

Tex. Bus. Orgs. Code § 21.223(a)(2). This statute provides an exception to this exemption from liability "if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or

affiliate." *Id.* § 21.223(b). "Actual fraud" is defined as "involv[ing] dishonesty of purpose or intent to deceive." *Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497 (Tex. App.–Houston [1 Dist.] 2012, writ dism'd) (citation omitted). Courts may deduce fraudulent intent from all of the facts and circumstances. *See Matter of Chastant,* 873 F.2d 89, 91 (5th Cir. 1989) (citations omitted). Further, the liability of the corporation's shareholder/owner or an affiliate of that shareholder/owner "for an obligation that is limited by Section 21.223 is exclusive and preempts any other liability imposed for that obligation under common law or otherwise." Tex. Bus. Orgs. Code § 21.224.

Similarly, a member or manager of an LLC "is not liable for a debt, obligation, or liability of a limited liability company, including a debt, obligation, or liability under a judgment, decree, or order of a court," except to the extent that "the company agreement specifically provides otherwise." Tex. Bus. Orgs. Code § 101.114.

### 2.     *Piercing the Corporate Veil of a Corporation or LLC*

Due to the limited liability that corporations and LLCs offer to their owners, a plaintiff seeking to impose individual liability on an owner must "pierce the corporate veil." Under Texas law, "an assertion of veil piercing or corporate disregard does not create a substantive cause of action[;] . . . such theories are purely remedial and serve to expand the scope of potential sources of relief by extending to individual shareholders or other business entities what is otherwise only a corporate liability." *In re JNS Aviation, LLC*, 376 B.R. 500, 521 (Bankr. N.D. Tex. 2007), *aff'd*, 395 F. App'x 127, 128 (5th Cir. 2010) (intervening procedural history and citation omitted). Veil-piercing and "alter ego" principles apply equally to corporations and LLCs. *See id.* at 530–31.

In a landmark decision, the Texas Supreme Court held in *Castleberry v. Branscum* that the limitation on liability that the corporate structure affords can be ignored "when the corporate form has been used as part of a basically unfair

device to achieve an inequitable result." *See* 721 S.W.2d 270, 271–72, 273 (Tex. 1986)*, superseded on other grounds by* former Bus. Corp. Act art. 2.21, re-codified at Tex. Bus. Orgs. Code § 21.223 (citations omitted). Further, "constructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Id.* at 273 (quoting *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1965) (citations omitted)).

Under the doctrine of constructive fraud, "[n]either fraud nor an intent to defraud need be shown as a prerequisite to disregarding the corporate entity; it is sufficient if recognizing the separate corporate existence would bring about an inequitable result." *Id.* at 272–73 (alteration in original) (citations omitted). "Examples [of an inequitable result] are when the corporate structure has been abused to perpetrate a fraud, *evade an existing obligation*, achieve or perpetrate a monopoly, circumvent a statute, protect a crime, or justify wrong." *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 451 (Tex. 2008) (emphasis added) (citing *Castleberry*, 721 S.W.2d at 272). The *Castleberry court* also stated that, "[t]o prove there has been a sham to perpetrate a fraud, tort claimants and contract creditors must show only constructive fraud." 721 S.W.2d at 273.

In *SSP Partners*, the Texas Supreme Court later clarified: "[i]n *Castleberry*, we held that the corporate structure could be disregarded on a showing of constructive fraud, even without actual fraud. The Legislature has since rejected that view *in certain cases*." 275 S.W.3d at 455 (emphasis added) (citation omitted). Specifically, the Legislature subsequently enacted the aforementioned sections of the Texas Business Organizations Code relating to limited liability in some contexts, unless, *inter alia*, the complainant proves "actual fraud" relating to "any contractual obligation of the corporation." *See* Tex. Bus. Orgs. Code §§ 21.223(a)(2), (b).

No. 12-20517

Then, in 2011, the Texas legislature added a new section 101.002 to Title 3 of the Texas Business Organizations Code, which specifies, *inter alia*, that the code provisions regulating and restricting veil piercing of corporations, Tex. Bus. Orgs. Code §§ 21.223 and 21.224, also apply to LLCs, their members, and their managers. *See* Act of Apr. 20, 2011, 82d Leg., R.S., ch. 25, §§ 1–2, 2011 Tex. Gen. Laws 45, 45 (identifying an effective date of September 1, 2011).

In *Shook v. Walden*, a Texas appeals court addressed the standard for piercing the corporate veil of an LLC that was incorporated prior to September 1, 2011, the effective date of the aforementioned statutory amendments. 368 S.W.3d 604, 613–14 (Tex. App.–Austin 2012, pet. denied) (citations omitted). The *Shook* court held that a plaintiff seeking to pierce the veil of LLCs that are not covered by the amendments must meet the same requirements as if the entity were a corporation, *i.e.*, a claimant must prove that the individual used the LLC form to perpetrate actual fraud for the individual's direct personal benefit. *See id.* 621–22 (citation omitted). Notably, the *Shook* suit concerned the LLC member's liability for the LLC's contractual obligations. *See id.* at 611.

No. 12-20517

The *Shook* court discussed the foregoing progression of Texas law relating to veil-piercing,[8] and explained that the Legislature's actions evidenced a balancing of policy interests relating to economic regulation:

> This balancing in part reflects a distinction, also reflected in pre-*Castleberry* cases, between the perceived relative equities of veil-piercing claimants who are asserting tort theories of recovery versus those suing in contract. The basic notion was that contract claimants, unlike most third parties suing in tort, had voluntarily chosen to deal with the corporation and, "[a]bsent some deception or fraud," would have had the opportunity to apportion, through negotiated contract terms, the risk that the entity would be unable to meet its obligations.

*See id.* at 619–20 (alteration in original) (citations omitted).

### 3.    *Parties' Arguments*

The parties dispute whether Spring Street must prove "actual fraud" or merely "constructive fraud" in order to pierce DKL&DTL's corporate veil.

Long Lam and En Lam contend that Spring Street must prove actual fraud for Long Lam and En Lam's direct benefit in order for Spring Street to

---

[8] The *Shook* court observed:

> At the time the Texas Supreme Court decided *Castleberry*, in 1986, the Legislature had not yet expressed its views through statute regarding the appropriate balancing of [policy interests concerning matters of economic regulation]. Within a few years thereafter, the Legislature spoke through the 1989 amendments to former Business Corporation Act article 2.21, and again through subsequent amendments. In so doing, the Legislature struck a balance that differed markedly from that of the *Castleberry* court with respect to veil piercing to impose individual liability for corporate contractual obligations—a claimant must prove that the individual used the corporate form to perpetrate actual fraud (i.e., that characterized by deliberately misleading conduct) for the individual's direct personal benefit.

*Shook*, 368 S.W.3d at 620 (citations omitted).

27

pierce the corporate veil of DKL&DTL. They argue, "*Shook* requires [Spring Street] to prove that the individual member of the LLC used the company to perpetrate an actual fraud for the direct personal benefit of the member." They further assert: "the plaintiff has pled constructive fraud on creditors; and, having selected that cause of action, forfeits the right to pursue the individual members because the statutory cause of action against individual members is exclusive as to all other causes of action, including constructive fraud."

Spring Street first points out that "fraudulent transfers of assets" is a tort under Texas law. Accordingly, Spring Street maintains that the "actual fraud" standard that Long Lam and En Lam urge does not apply in this case. Rather, according to Spring Street, if a case does not involve a "contractual obligation of the corporation or any matter relating to or arising from the obligation," Tex. Bus. Orgs. Code § 21.223(2) does not apply, and the common-law rules of veil-piercing, as set forth in *Castleberry,* govern. Spring Street further argues that, "under *Castleberry*, only a showing of constructive fraud is required to pierce the corporate veil." Lastly, Spring Street asserts that its evidence meets either the actual fraud or the constructive fraud standard.

*4.    Discussion*

We need not resolve whether the standard is invariably that of constructive fraud where fraudulent transfers have occurred, because Spring Street has offered ample evidence to demonstrate Long Lam and En Lam's actual fraud here. Spring Street has summarized this evidence as follows: (1) they "formed an LLC ten days after their brother Douglas Lam received notice that his debts were being accelerated"; (2) they "paid no consideration for a 25% interest each in his assets"; (3) they "personally signed a paper transferring one of those assets to another family member for no consideration"; (4) they "failed to disclose this fact for over a year while their entity was involved in [this] litigation"; (5) they "tried to evade company liability under TUFTA by allowing

the company charter to lapse"; and (6) they "then tried to evade individual liability by claiming the charter had been reinstated." Long Lam and En Lam, along with the other DKL&DTL members, acted for their direct personal benefit, they had no other interest to serve.

Based on these actions, we conclude that Spring Street may pierce DKL&DTL's corporate veil on the basis of fraud and impose individual liability on the LLC members.[9] Accordingly, we AFFIRM the district court's judgment on this ground.

## V.

For the foregoing reasons, we AFFIRM the district court's judgment in all respects, except as to Spring Street's fraudulent transfer claim against Ten Lam and Ngo for the amount of $150,000. We VACATE this judgment on this latter basis, and REMAND for further proceedings.

---

[9] As we conclude that Spring Street may pierce the corporate veil, we need not reach Long Lam and En Lam's argument that the purported reinstatement of DKL&DTL's corporate charter relates back to the filing of this suit and precludes finding them individually liable for the transfers here. *See Bluebonnet Farms, Inc. v. Gibraltar Sav. Ass'n*, 618 S.W.2d 81, 85 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.) (holding that, "[o]nce [a] corporation pays the delinquent taxes and is reinstated, this subsequent payment will relate back and revive whatever rights the corporation had at the time the suit was instituted.").