# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 18-2674

———————————————

Granite Re, Inc., an Oklahoma Corporation

*Plaintiff - Appellant*

v.

National Credit Union Administration Board, as Conservator of Citizens
Community Credit Union, Citizens Community Credit Union

*Defendant - Appellee*

——————

Appeal from United States District Court
for the District of North Dakota - Bismarck

——————

Submitted: December 12, 2019
Filed: April 24, 2020

——————

Before LOKEN, GRASZ, and STRAS, Circuit Judges.

——————

GRASZ, Circuit Judge.

After Citizens Community Credit Union ("Citizens") issued Granite Re, Inc. ("Granite") a letter of credit, the National Credit Union Administration Board ("NCUAB") appointed itself conservator of Citizens and repudiated the letter of credit. Granite filed a complaint for damages against the NCUAB claiming wrongful

repudiation and wrongful dishonor of a letter of credit. The NCUAB moved to dismiss Granite's complaint, with prejudice, arguing 12 U.S.C. § 1787(c) authorized it to repudiate the letter of credit with no liability to Granite for damages and that § 1787(c) preempted conflicting North Dakota law. The district court agreed and granted the NCUAB's motion to dismiss. We reverse.

## I. Background

Granite provides contractor surety bonds, and Citizens is a North Dakota credit union. At the request of Vortex Drain Tiling, LLC ("Vortex"), Citizens issued Granite a clean irrevocable letter of credit in the amount of $385,000.[1] Granite relied on the letter of credit to then issue Vortex several payment and performance bonds to undergird Vortex's municipal construction contracts. Granite's overall liability on the bonds exceeds $4 million, and it has "incurred substantial losses" on those bonds.

Citizens issued the letter of credit on July 8, 2015. The letter provides: "We [Citizens] warrant to you [Granite] that all drafts under this CLEAN IRREVOCABLE LETTER OF CREDIT will be duly honored upon presentation of your draft on us . . . on or before the expiration date, or on or before any automatically extended date . . . ." It then states that the letter of credit expires July 7, 2016, "but will be

---

[1]Standby letters of credit serve as security devices. *See generally* 1 Richard A. Lord, *Williston on Contracts* § 2:23 (4th ed. 2007). Typically, an underlying agreement or contract is involved — here, the agreement that Granite would issue Vortex payment and performance bonds to undergird Vortex's municipal construction contracts. A party in Granite's shoes may want assurances that it can recoup at least some of its losses in the event a party like Vortex fails to perform its construction contracts requiring Granite to pay the municipalities the amounts due under the bonds. This is where the letter of credit comes in. Before issuing the payment and performance bonds, Granite can require Vortex to have its bank or credit union — here, Citizens — issue Granite a letter of credit.

automatically extended for additional and consecutive one year terms" unless Citizens notifies Granite of its intent to not renew at least thirty days before the original or any subsequent expiration date.

On May 25, 2017, Citizens notified Granite the letter of credit would mature July 6 and would not be renewed. Granite then timely presented Citizens with a request for payment in the amount of $385,000 on July 3, but Citizens never issued the funds. On July 6, Citizens's CEO informed Granite it would not be issuing the requested funds, and Granite learned — presumably from the CEO — that on June 23 the NCUAB had appointed itself conservator of Citizens. *See generally* 12 U.S.C. § 1786(h). Still, Granite demanded that Citizens honor its draft under the letter of credit.

On July 20, the NCUAB sent Granite a letter explaining its broad authority as conservator under 12 U.S.C. § 1787(b)(2) and (c), including the authority to repudiate contracts. The letter also explained how the NCUAB believed the continuation of the letter of credit would burden Citizens and hinder the orderly administration of its affairs. The NCUAB then concluded by repudiating the letter of credit, which it had determined was necessary to the conservation of Citizens's assets.

In response, Granite demanded the NCUAB pay it $385,000 in damages for repudiating the letter of credit. The NCUAB acknowledged 12 U.S.C. § 1787(c)(3) provides Granite a limited remedy for damages, but it maintained the measure of Granite's damages under the statute was $0. The NCUAB's position was this: § 1787(c)(3)(A) limits a conservator's liability for repudiation damages to "actual direct compensatory damages determined as of the date of the appointment of the conservator," and because Granite had not presented Citizens with a draft as of the date the NCUAB appointed itself conservator, Granite had no claim for damages.

With its letter of credit repudiated and its request for damages denied, Granite then sought legal redress, filing a complaint in federal district court seeking $385,000 in damages for wrongful repudiation and wrongful dishonor of a letter of credit under section 41–05–11 of North Dakota's Uniform Commercial Code. *See* N.D. Cent. Code § 41–01–01 (stating Title 41 of the North Dakota Century Code "may be cited as the Uniform Commercial Code."). The NCUAB moved to dismiss Granite's complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, asserting its position that Granite was entitled to no damages under § 1787(c)(3). The NCUAB also argued § 1787(c)(3) preempts section 41–05–11 to the extent that the state statute provides Granite damages where the federal statute does not.

The district court granted the NCUAB's motion and dismissed Granite's complaint. The district court agreed with the NCUAB that § 1787(c)(3) preempted section 41–05–11. It also agreed that Granite was not entitled to damages under § 1787(c)(3) because "[a]t the time of the NCUAB's appointment as conservator for Citizens (June 23, 2017), Granite had not yet made a draw request on the Letter of Credit." Granite appeals the dismissal of its complaint.

## II. Analysis

Having jurisdiction under 12 U.S.C. § 1789(a)(2) and 28 U.S.C. § 1291, we review the grant of a motion to dismiss under Rule 12(b)(6) de novo, accepting the factual allegations in the complaint as true and viewing them in a light most favorable to the nonmovant. *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019). We do not accept the complaint's legal conclusions. *Id.*

On appeal, Granite argues the NCUAB had no authority to repudiate the letter of credit under § 1787(c)(1) because it is not a "contract." *See* 12 U.S.C. § 1787(c)(1) (authorizing the conservator to repudiate "any contract"). Alternatively, Granite argues that if the letter of credit is a contract, then it is entitled to damages for the NCUAB's

repudiation under § 1787(c)(3). Lastly, Granite argues § 1787(c) does not preempt section 41–05–11 of North Dakota's Uniform Commercial Code because the two laws are not in conflict. We take these arguments in turn.

## A. Applicability of § 1787(c)

Granite argues § 1787(c) does not apply to the NCUAB's repudiation of the letter of credit because it authorizes a conservator to repudiate contracts and the letter of credit issued by Citizens is not a contract. We disagree. The letter of credit issued by Citizens is a contract for purposes of § 1787(c).

Section 1787(c)(1) authorizes the conservator of an insured credit union to "repudiate any contract or lease to which [the] credit union is a party" if the conservator determines performance would be "burdensome" and that repudiation "will promote the orderly administration of the credit union's affairs."

Granite contends the letter of credit issued by Citizens is not a contract under § 1787(c)(1) because it does not satisfy all the elements of an enforceable contract under North Dakota law. But North Dakota law is not the proper starting point for the analysis. Whether "any contract" in § 1787(c)(1) includes the letter of credit issued by Citizens is a matter of federal statutory interpretation. *Cf. Molzof v. United States*, 502 U.S. 301, 305 (1992) (stating "the meaning of the term 'punitive damages' as used in [28 U.S.C.] § 2674, a federal statute, is by definition a federal question.").

The Federal Credit Union Act, 12 U.S.C. § 1751 *et seq.*, does not define the phrase "any contract" or the word "contract," and we generally give undefined words and phrases their ordinary, contemporary, common meaning. *Perrin v. United States*, 444 U.S. 37, 42 (1979). But two specific principles of statutory interpretation guide

our analysis here. First, when Congress enacted § 1787,[2] the word "contract" had a well-understood common law meaning. So we presume Congress intended to adopt its common law definition. *United States v. Shabani*, 513 U.S. 10, 13 (1994) (citing *Molzof*, 502 U.S. at 307–08). Second, "the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)). So rather than focus on the word "contract" in isolation, we must give effect to the phrase "any contract."

When Congress enacted § 1787, common law defined the word "contract" as "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Restatement (Second) of Contracts § 1 (Am. Law Inst. 1981); *see also Contract*, Black's Law Dictionary (5th ed. 1979) (defining "contract" as "[a]n agreement between two or more persons which creates an obligation to do or not to do a particular thing.").[3] The word "is generic" and commonly understood to "include[ ] varieties described as voidable, unenforceable, formal, informal, express, implied . . ., unilateral, [and] bilateral." Restatement (Second) of Contracts § 1 cmt. f.

Guided by this understanding of the common law definition of a contract, we conclude the expansive phrase "*any* contract" in § 1787(c) includes the letter of credit

---

[2]Section 1217 of the Financial Institutions Reform, Recovery, and Emergency Enforcement Act of 1989 amended the Federal Credit Union Act to include the provisions of 12 U.S.C. § 1787(c). Pub. L. No. 101-73, § 1217, 103 Stat. 183.

[3]Relying on the principle that common law terms take their common law definition, the Second Circuit interpreted "contract" in § 1787(c) to mean "a promissory agreement between two or more persons that creates, modifies, or destroys a legal relation." *Nat'l Credit Union Admin. Bd. v. Goldman, Sachs & Co.*, 775 F.3d 145, 148 (2d Cir. 2014) (quoting *Resolution Tr. Corp. v. Diamond*, 45 F.3d 665, 672 (2d Cir. 1995) (quoting *Contract*, Black's Law Dictionary (4th ed. 1951)).

issued by Citizens. In the letter of credit, Citizens promised to pay Granite $385,000 upon receipt of Granite's proper draft, and North Dakota's Uniform Commercial Code provides a remedy for the breach of that specific promise. N.D. Cent. Code § 41–05–11; *see* Restatement (Second) of Contracts § 1. Indeed, Granite itself recognizes the promise made by Citizens in the letter of credit as a legally enforceable obligation to issue funds. This fits the common law definition of a contract. And Granite's contention that the letter of credit may not otherwise have all the essential elements of a contract under section 9–01–02 of the North Dakota Century Code does not preclude it from being a contract under § 1787(c).

Granite points out that, in *LeaseAmerica Corp. v. Northwest Bank Duluth, North America*, we "acknowledge[d] authority that a letter of credit is not a contract." 940 F.2d 345, 348 (8th Cir. 1991). But we have never held that a letter of credit is not a contract generally, let alone for purposes of § 1787(c). In any case, our conclusion is consistent not only with common law, but also with respected secondary authority recognizing letters of credit as contracts. 1 Richard A. Lord, *Williston on Contracts* § 1:11 (4th ed. 2007) ("Letters of credit are another type of commercial specialty properly includable within the definition of a formal contract.").

## B. Damages

Having concluded that the letter of credit issued by Citizens is a contract for purposes of § 1787(c)(1), we now address whether Granite's complaint stated a claim for damages under § 1787(c)(3). The district court concluded Granite failed to state a claim for damages as a matter of law because Granite did not present a demand for payment to Citizens before the NCUAB appointed itself conservator of Citizens. Granite argues this reasoning is flawed and that its complaint alleged enough facts to support a plausible claim for damages. We agree with Granite.

While § 1787(c)(1) authorizes the conservator of an insured credit union to repudiate contracts, § 1787(c)(3) makes the conservator liable to the injured party for damages. The conservator's liability, however, is "limited to actual direct compensatory damages . . . *determined as of the date of the appointment of the conservator.*" 12 U.S.C. § 1787(c)(3)(A)(i), (ii)(I) (emphasis added). And "actual direct compensatory damages" excludes "punitive or exemplary damages," "damages for lost profits or opportunity," and "damages for pain and suffering." 12 U.S.C. § 1787(c)(3)(B)(i)–(iii).

In concluding Granite had no recoverable damages under § 1787(c)(3), the district court adopted the District of New Hampshire's rationale and explained that "no damages would be due as long as the triggering event — the presentation of a sight draft — had not occurred prior to the date of the appointment of the conservator." *See Credit Life Ins. Co. v. FDIC*, 870 F. Supp. 417, 425–26 (D.N.H. 1993). This construction of § 1787(c)(3) requires letter-of-credit beneficiaries to be prescient of an impending conservatorship in order to recover damages, and we do not endorse it. The failure to present the issuer of a letter of credit with a sight draft before appointment of a conservator does not necessarily preclude recovery of damages under § 1787(c)(3).

For example, and as Granite argues, the beneficiary of a valid letter of credit may realize actual direct compensatory damages prior to the date of the conservatorship as a result of its reliance on that letter of credit. *Cf. Nashville Lodging Co. v. Resolution Tr. Corp.*, 59 F.3d 236, 245–46 (D.C. Cir. 1995) (citing *DPJ Co. v. FDIC*, 30 F.3d 247, 249–50 (1st Cir. 1994)).[4] As explained above, clean letters of credit, like the one issued by Citizens, operate as security devices which assure virtually unrestricted access to payment on demand. Lord, *supra*, § 2:23. So actions taken in reliance on a clean letter of credit are expected.

---

[4]Cases like *Nashville Lodging* applying the provisions of 12 U.S.C. § 1821(e) are useful here because the relevant portions of § 1821(e) and § 1787(c) are materially identical. *See Goldman, Sachs & Co.*, 775 F.3d at 148.

Here, Granite's complaint alleges that before the NCUAB appointed itself conservator, Granite issued Vortex over $4 million in contractor surety bonds specifically in reliance on its ability to draw on the clean letter of credit issued by Citizens. It also alleges Granite incurred "substantial losses" on those bonds. Granite would have used the letter of credit to cover up to $385,000 of those losses but must now cover them itself because the NCUAB repudiated the letter of credit. These alleged losses are actual, sufficiently direct, and do not fall within any of the excluded categories of damages listed in § 1787(c)(3)(B).[5] And although Granite does not expressly allege it realized these damages on or before June 23, we make the reasonable inference it did. *See Varga v. U.S. Bank Nat'l Ass'n*, 764 F.3d 833, 838 (8th Cir. 2014) (explaining we draw all reasonable inferences in favor of the plaintiff when reviewing a motion to dismiss). Neither the district court's order nor the NCUAB's brief address whether these allegations state a plausible claim for damages under § 1787(c)(3), but we conclude they do. *Kuhns v. Scottrade, Inc.*, 868 F.3d 711, 717 (8th Cir. 2017) ("A claim is plausibly pleaded when its factual context . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (alteration in original) (internal quotation omitted).

If we were to adopt the NCUAB's construction of § 1787(c)(3), the NCUAB could quietly appoint itself conservator and repudiate letters of credit with no liability to the injured beneficiary. Absent the ability to predict an impending conservatorship, a clean letter-of-credit beneficiary like Granite is subject to repudiation with no recourse. This construction is inconsistent with the language of § 1787(c)(3), which provides a limited remedy for damages determinable at the point of conservatorship but does not negate recovery entirely. And under its construction, we believe the

---

[5]These damages are distinguishable from the contract fees that we characterized as damages for lost profits or opportunity in *Resolution Trust Corp. v. Management, Inc.*, 25 F.3d 627, 631–32 (8th Cir. 1994).

NCUAB's repudiation would at least implicate the Fifth Amendment's Takings Clause. *See* U.S. Const. amend. V (providing "private property" shall not "be taken for public use, without just compensation"); *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) (explaining the purpose of the Takings Clause "is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole'") (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001)). We must construe the statute in a way that avoids such constitutional doubt. *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) ("[A] court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems.").

## C. Preemption

Finally, we address the district court's conclusion that § 1787(c)(3) conflicts with and therefore preempts section 41–05–11 of North Dakota's Uniform Commercial Code. The district court concluded the limited damages recoverable under § 1787(c)(3) conflict with the broader damages recoverable under section 41–05–11. Granite argues the laws do not actually conflict because both allow Granite to recover the full amount of damages alleged in its complaint. We conclude it is premature to declare § 1787(c)(3) actually conflicts with and preempts section 41–05–11.

As noted above, § 1787(c)(3)(A) limits damages "to actual direct compensatory damages . . . determined as of the date of the appointment of the conservator," and § 1787(c)(3)(B) excludes from recovery "punitive or exemplary damages," "damages for lost profits or opportunity," and "damages for pain and suffering." Damages are not similarly limited under section 41–05–11 of North Dakota's Uniform Commercial Code. If an issuer "repudiates its obligation to pay money under a letter of credit before presentation [of a draft], the beneficiary . . . may recover from the issuer the amount that is the subject of the . . . repudiation." N.D. Cent. Code § 41–05–11.1. And if an issuer "wrongfully dishonors a draft or demand presented under a letter of

credit . . ., the applicant may recover damages resulting from the breach, including incidental but not consequential damages." *Id.* § 41–05–11.2.

In theory, § 1787(c)(3) and section 41–05–11 conflict because the former provides a much more limited remedy for damages than the latter. But as Granite points out, the laws are otherwise reconcilable where a particular plaintiff's recoverable damages are the same under either statute. Until it is clear that Granite's recovery under section 41–05–11 exceeds the limits of § 1787(c)(3), we need not address whether there is an actual conflict between the two for purposes of preemption. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 90 (1990) (explaining Supreme Court decisions prohibit "seeking out conflicts between state and federal regulation where none clearly exists") (internal quotation omitted); *see also Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982) ("The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute.").

### III. Conclusion

We reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

_____