# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 2, 2021

Lyle W. Cayce
Clerk

No. 20-30173

Lexon Insurance Company, Incorporated,

*Plaintiff—Appellant*,

*versus*

Federal Deposit Insurance Corporation, *as receiver for First NBC Bank, New Orleans, LA*; United States of America,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:18-CV-4245

Before Elrod, Duncan, and Wilson, *Circuit Judges*.

Jennifer Walker Elrod, *Circuit Judge*:

Lexon Insurance Company appeals the district court's grant of summary judgment to the Federal Deposit Insurance Corporation in its Receiver capacity (the FDIC-R) and argues that the FDIC-R improperly repudiated two letters of credit. Lexon also appeals the district court's Rule 12(b)(1) dismissal of its Federal Tort Claims Act claim against the FDIC in its corporate capacity (FDIC-C). We AFFIRM.

I.

In 2016, appellant Lexon executed performance bonds totaling approximately $11 million to the Bureau of Ocean Energy Management[1] on behalf and as certified surety of non-party Linder Oil Company. Lexon, in turn, required the oil company to post collateral that Lexon would hold until the Bureau released Lexon from liability under the bonds. To acquire the collateral, the oil company applied to First NBC, a then-functioning Louisiana bank, which issued two letters of credit amounting to $9,985,500, with Lexon as the beneficiary. Functionally, this reduced Lexon's liability on the bonds from about $11 million to less than $2 million.

Lexon had a right to draw on the letters of credit if Lexon determined in its "sole judgment" that the funds were required for Lexon's "protection" against "claims that had been or may be made" against the bonds. Initially, the letters of credit were valid through March 2017, but they were set to automatically renew for successive one-year terms unless and until the bank gave Lexon advance notice of non-renewal.

Not all was well at the bank. The FDIC and state regulators became concerned about the bank's viability and, in November 2016, entered a consent order that granted the FDIC-C control of the bank. The order prohibited the bank from subsequently extending "additional credit

---

[1] The Bureau of Ocean Energy Management, part of the United States Department of the Interior, leases oil and gas rights on the outer Continental Shelf to private developers. *See* 43 U.S.C. §§ 1332, 1334. At the end of a lease, the lessee must permanently plug all wells, remove all platforms, and clear the seafloor of all obstructions. *See* 30 C.F.R. §§ 250.1702, 250.1703 (2019). To guarantee compliance with these and other lease obligations, a lessee must provide the Bureau with non-cancellable bonds, issued by a certified surety, which are payable on demand to the Bureau's regional director. *See id.* §§ 556.900(a), 556.902(a), (b), (d) (2016). The surety will remain liable on the bonds until the Bureau determines that all lease obligations are satisfied. *See id.* §§ 556.902(d), 556.906.

to . . . any borrower whose existing credit ha[d] been classified Loss by the FDIC."

On April 28, 2017, Louisiana regulators closed the bank and appointed the FDIC-R as receiver. Over the next few months, the FDIC-R indicated to Lexon on at least two occasions that the letters of credit might be repudiated. In June and August of 2017, the FDIC-R sent Lexon letters "strongly suggest[ing]" that Lexon "immediately take any action necessary to protect [its] interests . . . . [including] arrang[ing] for the issuance of any new standby letter of credit from another financial institution." Lexon did not submit any draws on the letters of credit, nor did it arrange for any substitute letters of credit from other financial institutions.

As it turned out, not all was well with the oil company either. It was behind on over $100 million of loans from the bank and subsequently filed for bankruptcy. From when the FDIC-R took over the bank to when it sold the oil company's loan portfolio (about four months), it worked to resolve the oil company's loan portfolio. On September 28, 2017, the FDIC-R sold the oil company's loan portfolio to a third party, repudiated the letters of credit, and mailed Lexon notices of repudiation. Lexon attempted to draw on the letters of credit in December 2017, but the FDIC-R never responded.

Lexon filed this lawsuit against the FDIC-R, alleging violations of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). Under FIRREA and relevant here, the receiver of a failed financial institution may repudiate "any contract or lease": (1) to which the financial institution (here, the bank) is a party; (2) that the FDIC-R "determines to be burdensome;" and (3) the repudiation of which would, in the FDIC-R's "discretion . . . promote the orderly administration of the institution's affairs." 12 U.S.C. § 1821(e)(1). In addition, the receiver must repudiate the contract or lease within a "reasonable period following [its] appointment [as receiver]." § 1821(e)(2). Where the receiver repudiates a contract, the repudiation is treated as a breach of contract, but damages are

"limited to actual direct compensatory damages . . . determined as of . . . the date of the appointment of the . . . receiver." § 1821(e)(3)(A)(i)–(ii).

The district court granted the FDIC-R's motion to dismiss. It held that the letters of credit were "contract[s]" under § 1821(e)(1) and that the FDIC-R had repudiated the letters of credit within a "reasonable period" under § 1821(e)(2). The district court allowed Lexon leave to replead and conduct discovery. Lexon later filed an amended complaint reasserting its initial claims against the FDIC-R and adding a claim against the FDIC-C for negligence under the Federal Tort Claims Act. Lexon attached to its amended complaint over one hundred pages of depositions, evidence, and other materials that it had gathered in discovery. The crux of Lexon's complaint was that a letter of credit is not a "contract or lease" under § 1821(e)(1) and therefore cannot be repudiated by the FDIC-R. And even if a letter of credit were a contract, Lexon argued that the FDIC-R violated § 1821(e) by failing to repudiate in a "reasonable period." *See* § 1821(e)(2). Lexon also argued that it had suffered "actual direct compensatory damages" by virtue of its "lost collateral" of $9,985,500. *See* § 1821(e)(3)(A)(i).

The FDIC-R moved to dismiss Lexon's amended complaint under Federal Rule of Civil Procedure 12(b)(6). The district court *sua sponte* converted the FDIC-R's motion to dismiss into a motion for summary judgment. In its order on the converted motion for summary judgment, the district court reaffirmed its prior holding that a letter of credit is a contract, that the FDIC-R had repudiated the letters of credit within a reasonable period, and that Lexon had no recoverable damages. The district court dismissed the claims against the FDIC-R.

The FDIC-C moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction. A few months later, the district court dismissed Lexon's claims against the FDIC-C, holding that

Lexon failed to identify a viable claim under the Federal Tort Claims Act. Lexon timely appealed.

## II.

We "review a district court's grant of summary judgment de novo, applying the same standards as the district court." *Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 435 (5th Cir. 2013). A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a district court improperly entered "summary judgment *sua sponte* without notice," we review that decision for harmless error. *Atkins v. Salazar*, 677 F.3d 667, 678 (5th Cir. 2011).

## III.

Lexon raises several arguments on appeal. First, Lexon argues that the district court erred by granting summary judgment *sua sponte*. Second, Lexon argues that the district court should have ruled in its favor on the merits on its claims against the FDIC-R. Third, Lexon argues that the district court erred in dismissing its Federal Tort Claims Act claim against the FDIC-C. We address each argument in turn.

## A.

Lexon argues that the district court erred in *sua sponte* converting the FDIC-R's motion to dismiss into a motion for summary judgment. Although district courts may grant summary judgment *sua sponte*, they must first give the parties "notice and a reasonable time to respond." Fed. R. Civ. P. 56(f). *See also Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 28 F.3d 1388, 1397–38 (5th Cir. 1994); *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 210 (5th Cir. 2018). We "strictly enforce[]" the notice requirement. *D'Onofrio*, 888 F.3d at 210. If a district court erred by failing to give the parties notice, we review for harmless error. *Id.* Under that standard, a *sua sponte* grant of summary judgment can be affirmed "'if the

nonmoving party admits that he has no additional evidence anyway' or if 'the appellate court evaluates all of the nonmoving party's additional evidence and finds no genuine issue of material fact.'" *Id.* (quoting *Leatherman*, 28 F.3d at 1398).

Here, the district court erred by failing to give notice to the parties.[2] We ask, then, whether that error was harmless. Lexon argues that, had it received notice, it would have submitted different evidence of the value of its "lost collateral"—less than the full amount of the letters of credit. Lexon argues that the lost collateral, while perhaps not being worth the full value of the letters of credit, "had at least *some* economic value." However, Lexon never pleaded nor argued in the district court that its damages could be anything less than the full value of the letters of credit—$9,985,500. If the district court did not have an opportunity to rule on an argument, we will not address it on appeal. *FDIC v. Mijalis*, 15 F.3d 1314, 1327 (5th Cir. 1994). We therefore reject this argument.

Lexon also argues that the district court should not have granted summary judgment because the allegations in its amended complaint and the attached exhibits created a genuine issue of material fact as to whether the FDIC-R repudiated the letters of credit within a "reasonable period" under § 1821(e)(2). "An issue is material if its resolution could affect the outcome of the action." *Spring St. Partners-IV*, 730 F.3d at 435 (quoting *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001)). "We resolve factual controversies in favor of the nonmoving party, but only where there is an

---

[2] Here, Lexon arguably should have known that the district court would consider converting any dispositive motion from the FDIC into a motion for summary judgment because Lexon had conducted five months of discovery, attached to its amended complaint over one hundred pages of discovery documents, and relied on those documents in its amended complaint.

actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).

Lexon directs us to several pieces of evidence and argues that each presented a genuine issue of material fact. For example, Lexon cites a letter that was sent from the FDIC-R to the oil company four days after the FDIC's appointment as receiver. The letter explained that, "absent extraordinary circumstances," the FDIC-R would repudiate the letters of credit and invited the oil company to notify the FDIC-R within thirty days of any extraordinary circumstances that would warrant non-repudiation. In Lexon's view, this letter shows that it was unreasonable for the FDIC-R to "delay" repudiation of the letters of credit until 153 days after its appointment as receiver.

We disagree with Lexon and "find[] no genuine issue of material fact." *Leatherman*, 28 F.3d at 1398. Lexon's argument is based on cherry-picking language from some evidence and ignoring other evidence altogether. The above-described letter simply does not establish that the FDIC-R had decided to repudiate the letters of credit within four days of its appointment—much less that any delay greater than four days was "unreasonable" under § 1821(e)(2). Indeed, the letter indicated that a repudiation decision had *not* been made. Plus, not only did the oil company respond to the letter and negotiate with the FDIC-R over the next four months, the letters of credit were integral to the $100 million oil company loan portfolio—which the evidence unequivocally shows that the FDIC-R was trying to resolve.

Summary judgment is not foreclosed by "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *McCarty v. Hillstone Restaurant Grp., Inc.*, 864 F.3d 354, 357 (5th Cir. 2017) (quoting *Boudreaux*, 402 F.3d at 540).

Moreover, this case is different from *D'Onofrio*, where we held that "the lack of notice deprived the non-moving party of the opportunity to collect and submit summary judgment evidence." *D'Onofrio*, 888 F.3d at 211. In contrast, Lexon was given five months to conduct discovery and depose witnesses. It attached to its amended complaint sixteen exhibits—including deposition transcript excerpts, written correspondence, e-mails, and an asset report.

We hold that the district court did not err in *sua sponte* granting summary judgment.[3] Although it erred in failing to notify the parties, that error was harmless.

## B.

Lexon also argues that the district court should have ruled in its favor on the merits of its claims against the FDIC-R. Specifically, Lexon contends that a letter of credit is not a "contract or lease" that can be repudiated under § 1821(e)(1), that the FDIC-R did not repudiate in a "reasonable period" under § 1821(e)(2), and that it has "actual direct compensatory damages" to which it is entitled under § 1821(e)(3)(A)(i).

## 1.

Whether a letter of credit is a contract under § 1821(e)(1) is a question of first impression in our court. Title 12 U.S.C. § 1821(e) is part of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). FIRREA was "[p]assed in the wake of a national crisis in the banking and savings-and-loan industries, [and] was intended to promote stability, economic recovery, and increased public confidence." *FDIC v.*

---

[3] One of our sister circuits affirmed a grant of summary judgment to the FDIC where it had delayed repudiating a lease 206 days after appointment as receiver. *See BKWSpokane, LLC v. FDIC*, 663 F. App'x 524, 526–27 (9th Cir. 2016).

*McFarland*, 243 F.3d 876, 885 (5th Cir. 2001). Under FIRREA, the FDIC has the power to serve as a receiver for failed financial institutions. This includes FDIC-R's power to "repudiate contracts." 12 U.S.C. § 1821(e)(1). This power is granted in § 1821(e), which is titled: "Provisions relating to contracts entered into before appointment of conservator or receiver." Subsection (e)(1) states: "In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institution may disaffirm or repudiate *any contract or lease*" that the FDIC-R determines to be burdensome and the repudiation of which would, in the FDIC-R's "discretion . . . promote the orderly administration of the institution's affairs." § 1821(e)(1)(B), (C) (emphasis added).

"[A]bsent contrary indications, Congress intends to adopt the common law definition of statutory terms." *United States v. Shabani*, 513 U.S. 10, 13 (1994). Moreover, "we look to the ordinary meaning of the term . . . at the time Congress enacted the statute." *Perrin v. United States*, 444 U.S. 37, 42 (1979). We see no contrary indications, so we interpret "contract" in § 1821(e) according to its common law and ordinary meaning when FIRREA was passed in 1989.

In 1989, *Black's Law Dictionary* defined "contract" as "[a]n agreement between two or more persons which creates an obligation to do or not to do a particular thing." *Contract*, *Black's Law Dictionary* (5th ed. 1979). The Restatement's definition was in accord: "A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Restatement (Second) of Contracts § 1 (Am. L. Inst. 1981). A comment to the version of the Uniform Commercial Code in place in 1989 stated that a "letter of credit is essentially a contract between the issuer and the beneficiary." U.C.C. § 5-114 cmt. 1 (1977). "Letters of credit are another type of commercial specialty properly includable within the definition of a

formal contract." 1 Richard A. Lord, *Williston on Contracts* § 1:11 (4th ed. 2007). If the "skeletal . . . formalities" of letters of credit "are complied with, a binding agreement exists notwithstanding the absence of consideration." *Id.*

The district court concluded that letters of credit are contracts in the context of 12 U.S.C. § 1821. So do we. A letter of credit creates an "obligation" between the issuer (here, the bank) and the beneficiary (here, Lexon). *Contract*, *Black's Law Dictionary* (5th ed. 1979). It is a "promise" that the issuer will fulfill its obligation under the letter of credit. Restatement (Second) of Contracts § 1 (Am. L. Inst. 1981). Here, that meant that the bank promised to pay Lexon $9,985,500 upon a proper draw by Lexon on the letters. And UCC Article 5 provides a remedy for a breach of that promise— recovery of the amount of the letter of credit.

Although Lexon is correct that letters of credit lack some of the traditional elements of contracts (like mutual assent and consideration), we must give weight to Congress's inclusion of "any" before "contract or lease." "'[A]ny' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)). Lexon also argues that including letters of credit within the ambit of "contract" would swallow up "lease" in § 1821(e)(1). Not so. In our view, Congress likely said "contract or lease" in § 1821(e)(1) to preview FIRREA's different remedies for contracts as compared to leases. For contracts, damages are determined as of the date of the appointment of the receiver. § 1821(e)(3)(A)(ii)(I). For leases, damages are determined as of the date of repudiation. § 1821(e)(4)(B)(i). Thus, in this context, "lease" is a subspecies of "contract" and its inclusion in § 1821(e)(1) highlights its different treatment in certain respects. Therefore, our expansive interpretation of "any contract or lease" does not nullify "lease."

No. 20-30173

In *Granite Re, Inc. v. National Credit Union Administration Board*, the Eighth Circuit held that a "letter of credit . . . is a contract for purposes of" 12 U.S.C. § 1787(c) of the Federal Credit Union Act. *Granite Re, Inc. v. Nat'l Credit Union Admin. Bd.*, 956 F.3d 1041, 1045 (8th Cir. 2020). FIRREA amended the Federal Credit Union Act to include the provisions of § 1787(c), which are "materially identical" to the provisions of 12 U.S.C. § 1821(e) that are applicable to the FDIC. *See id.* at 1045 n.2, 1047 n.4. *See also Nat'l Credit Union Admin. Bd. v. Goldman, Sachs & Co.*, 775 F.3d 145, 148 n.3 (2d Cir. 2014). Thus, the "basic canon of statutory construction that identical terms within an Act bear the same meaning" applies here and we decline to split with the Eighth Circuit on the issue. *Est. of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992).

Letters of credit are repudiable contracts for the purposes of § 1821(e)(1).[4]

2.

Having held that a letter of credit is a contract under § 1821(e)(1), we now turn to Lexon's argument that the district court erred by holding that the FDIC-R repudiated the letters of credit in a "reasonable period" under

---

[4] We have previously described letters of credit as contracts on at least two occasions and as undertakings on at least one occasion. *See FDIC v. Plato*, 981 F.2d 852, 854 n.3 (5th Cir. 1993) ("A letter of credit transaction actually consists of three distinct contracts . . . [including] the letter of credit itself, [which is] a contract between the bank and seller . . . ."); *In re Coral Petroleum, Inc.*, 878 F.2d 830, 832 (5th Cir. 1989) ("[A] letter of credit transaction ordinarily involves three separate contracts . . . [including] the letter of credit itself, [which is] a contract between the issuing bank and the beneficiary."); *LaBarge Pipe & Steel Co. v. First Bank*, 550 F.3d 442, 450 (5th Cir. 2008) (A "letter of credit is an 'undertaking' (as opposed to a contract)."). None of these prior cases interpreted "contract" under § 1821. We are not bound by them. *See Granite Re*, 956 F.3d at 1046 ("[W]e have never held that a letter of credit is not a contract generally, let alone for purposes of § 1787(c).").

No. 20-30173

§ 1821(e)(2).  The FDIC-R repudiated the letters of credit 153 days after its appointment as receiver for the bank.

Whether a delay is reasonable depends on the facts and circumstances of the individual case.  *Bldg. Four Shady Oaks Mgmt. L.P. v. FDIC*, 504 F. App'x 292, 295 (5th Cir. 2012) (citing *Travelers Ins. Co v. Liljeberg Enters., Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994)).  The length of the delay is one, but not the only, factor.  *Id.*  We also consider whether the holder of the contract or lease suffered any prejudice from the delay and whether the FDIC-R acted in bad faith.  *Id.*; *see also Resol. Tr. Corp. v. CedarMinn Bldg. Ltd. P'ship*, 956 F.2d 1446, 1455 (8th Cir. 1992) (considering prejudice a central factor in the reasonableness analysis); *BKWSpokane LLC v. FDIC*, 12 F. Supp. 3d 1331, 1340 (E.D. Wash. 2014) ("Courts have looked to various factors . . . including evidence of the receiver's bad faith, prejudice to the nonrepudiating party caused by the delay, and whether delay was needless or stemmed from legitimate reasons."), *aff'd*, 663 F. App'x at 526–27.

Under the facts and circumstances of this case, we hold that the FDIC-R repudiated the letters of credit within a "reasonable period" under § 1821(e)(2).  During the 153 days between the FDIC-R's appointment and its repudiation of the letters of credit, the FDIC-R was engaged in extensive negotiations with the oil company about its problematic $100 million loan portfolio—part of which was the $9,985,500 letters of credit. [5]  There were ongoing e-mails and meetings on a daily basis about a potential settlement with the oil company.  This process involved costly valuation reports and a

---

[5] We have previously held in a non-precedential opinion that a 157-day delay between appointment and repudiation was a "reasonable period."  *Bldg. Four Shady Oaks Mgmt. L.P.*, 504 F. App'x at 293, 297, *aff'g* No. 3:10-CV-970, 2011 WL 13185720, at *5 (N.D. Tex. Dec. 23, 2011).

multi-tiered approval process within the FDIC-R for any proposals. Those negotiations broke down and the FDIC-R sold the oil company's loan portfolio to a third party. The very same day that the sale was executed, the FDIC-R repudiated the letters of credit and gave Lexon written notice that it had done so.

The FDIC-R did not act in bad faith. Indeed, Lexon was on notice throughout the entire delay that the letters of credit "might be repudiated" as explained by the FDIC-R's two letters to Lexon. In addition to warning that the letters of credit might be repudiated, the letters also "strongly suggested" that Lexon protect itself and acquire letters of credit from another financial institution. Lexon also suffered no prejudice as a result of the delay. There was no call for payment on the bonds during the delay. The delay granted Lexon more time to draw on the letters of credit (which it did not do) and gave Lexon more time to get letters of credit from another institution (which it also did not do).

The FDIC-R repudiated the letters of credit within a "reasonable period" under § 1821(e)(2).

3.

On its claims against the FDIC-R, Lexon's final argument is that the district court erred in holding that it does not have "actual direct compensatory damages." § 1821(e)(3)(A)(i). Any actual direct compensatory damages to which Lexon may be entitled are determined "as of . . . the date of the appointment of the . . . receiver." § 1821(e)(3)(A)(ii)(I). "'[A]ctual direct compensatory damages' does not include . . . (i) punitive or exemplary damages; (ii) damages for lost profits or opportunity; or (iii) damages for pain and suffering." § 1821(e)(3)(B)(i)–(iii).

No. 20-30173

Here, the FDIC-R was appointed receiver of the bank on April 28, 2017. Lexon argues that its damages on that date were the value of its "lost collateral"—the $9,985,500 value of the letters of credit. In other words, Lexon argues that it is entitled to the same amount of damages from proper repudiation by the FDIC-R as it would be entitled to if the FDIC-R had *im*properly repudiated the letters of credit.

We reject Lexon's argument and hold that it lacks "actual direct compensatory damages" under FIRREA. The value of "lost collateral" is not *actual*, *direct*, *compensatory* damages under FIRREA. Lexon does not allege any actual damages on the bonds by or before the FDIC-R's appointment.[6] We do not require "letter-of-credit beneficiaries to be prescient of an impending conservatorship in order to recover damages" nor do we require that a letter of credit be drawn on before the FDIC-R's appointment. *Granite Re*, 956 F.3d at 1046. In accordance with the statute, what we *do* require, however, is that actual direct compensatory damages be realized on or before the appointment date. *Id.* at 1047; § 1821(e)(3)(A)–(B). Lexon has neither alleged nor brought forth evidence of any such damages here.

C.

Lexon also brought a claim against the FDIC in its corporate capacity (the FDIC-C) under the Federal Tort Claims Act. The Act allows claims against the United States for damages caused by negligence of government employees "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act . . . occurred." 28 U.S.C. § 1346(b)(1). Lexon alleges that the

---

[6] Indeed, the Bureau of Ocean Management did not call for payment on the bonds until much later, in between the filing of Lexon's opening and reply briefs in this court.

14

FDIC-C negligently controlled the bank by allowing the letters of credit to renew in early 2017. The district court dismissed Lexon's claim for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Specifically, the district court held that Louisiana law does not impose a tort duty on an analogous private person acting in like circumstances to the FDIC-C.

Lexon argues that Article 2315 of the Louisiana Civil Code is the underlying state law that provides it a claim. That statute provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code art. 2315(A) (2004). Louisiana courts analyze Article 2315 according to general principles of negligence law, including duty-risk analysis. *Bursztajn v. United States*, 367 F.3d 485, 489 (5th Cir. 2004). A plaintiff must show: (1) duty, (2) breach of the duty, (3) causation in fact, (4) legal causation, and (5) actual damages. *Id.*

The closest analogy to the FDIC-C in the private sphere is the regulatory function of the Louisiana Office of Financial Institutions. But the Supreme Court has rejected imposing tort duties on federal entities based on state-law liabilities for state entities. *See United States v. Olson*, 546 U.S. 43, 46 (2005). Thus, Lexon must resort to the only remaining, conceivable avenue of relief—the "Good Samaritan" theory. *Id.* at 45–47. In Good Samaritan cases, the Louisiana Supreme Court has adopted the standard found in the Restatement (Second) of Torts, § 324A.

Lexon's Good Samaritan claim fails on at least two fronts. First, § 324A requires "physical harm." Restatement (Second) of Torts § 324A (Am. L. Inst. 1965). Lexon has alleged only financial harms, not physical harms. Second, § 324A imposes liability only where the allegedly at-fault party "undertake[s] to perform a duty owed by the other to the third [party]." Here, the "undertake[r]" would be the FDIC-C; the "other"

15

would be the bank; and the "third [party]" would be Lexon. The FDIC-C did not have a duty to Lexon as a third party, much less a duty to prevent the letters of credit from renewing.[7] *See, e.g.*, *First State Bank of Hudson Cnty. v. United States*, 599 F.2d 558, 563 (3d Cir. 1979) ("When the FDIC carried out its responsibilities . . . its purpose was to safeguard this system of insurance . . . not . . . to fulfill an obligation to notify the insured bank of any unlawful banking practice."); *Fed. Savs. & Loan Ins. Corp. v. Shelton*, 789 F. Supp. 1367, 1369 (M.D. La. 1992) ("It is clear that the FDIC[-C] owes no duty to manage a bank."); *FDIC v. Raffa*, 935 F. Supp. 119, 124 (D. Conn. 1995) ("The [FDIC-C's] 'No Duty Rule' paints a bright line that maintains the court's focus on the persons whose alleged wrongdoing brought about the insolvency in the first instance."); *Fed. Savs. & Loan Ins. Corp. v. Roy*, No. CIV JFM-87-1227, 1988 WL 96570, at *1 (D. Md. June 28, 1988) ("[N]othing could be more paradoxical or contrary to sound policy than to hold that it is the public which must bear the risk of errors of judgment made by its officials in attempting to save a failing institution—a risk which would never have been created but for defendants' wrongdoing in the first instance.").

Lexon failed to establish an analogous private liability and the district court correctly dismissed Lexon's Federal Tort Claims Act claim for lack of subject-matter jurisdiction.

*        *        *

The judgment of the district court is AFFIRMED.

---

[7] The consent order did not prohibit the FDIC-C from maintaining then-current lines of credit or allowing then-current credit to renew. Rather, it prohibited only the "exten[sion of] . . . any *additional* credit." (emphasis added).